## WILSON FITZGERALD v. DANIEL FAUNCE, JR.

1. The Riparian act of 1869, which gives the riparian commissioners power to make grants of lands of the state under tide-waters to other persons than riparian owners, applies only to the tide-waters of the Hudson river, New York bay and Kill von Kull, lying between Engard's dock on the Kill von Kull and the New York State line. Provision for grants of the state's lands under tide-water by the commissioners elsewhere than within the territory designated in the act of 1869, is made by the act of March 21st, 1871, which authorizes grants to riparian owners only.

2. W., the owner of a farm situate on the tide-waters of the Delaware river, in 1808 conveyed to F., his heirs and assigns, "the sole right, use and enjoyment for all purposes of fishing whatsoever, and for no other purpose, "of a strip of land, the boundaries of which were along the middle of an artificial bank four feet wide on top, which had been constructed to prevent the flow of tides over the lowland, until the line strikes the natural bank, thence to a stone near the Delaware river, and from thence into the river to low-water mark, thence, &c.; with a covenant of warranty against all persons claiming under the grantor or his heirs. In 1819 W. conveyed the farm to N., with an exception and reservation of the fishery, and privileges granted to F. by the deed of 1818. In 1876 the plaintiff, who acquired title under N., obtained from the riparian commissioners a grant of the state's land under tide-water in front of the premises. In an action of trespass against persons who had succeeded to the fishery and rights granted by W. to F. by the deed of 1818—*Held*, that the deed to F. conveyed an actual estate in the strip of land next to the river, and he became thereby riparian owner; and that if the estate granted to F. and his heirs and assigns was so qualified, as to use, that neither he nor they could make a grant from the state available, the intervention of it between the upland and the river would make the plaintiff's grant from the riparian commissioners inoperative as against the estate and rights granted and conveyed by W. to F. by the deed of 1818.

On error to the Gloucester Circuit.

This suit is an action of trespass to recover damages for an unlawful entry upon lands of the plaintiff, situate in the township of West Deptford, in the county of Gloucester, consisting in part of upland and in part of land under the

waters of the Delaware river. The acts complained of as trespass were divers acts done in the working of a fishery in April and May, 1881.

Fitzgerald, the plaintiff, derived his title to the upland from Samuel Whitall, who obtained title by a deed from Biddle Reeves and others, dated March 10th, 1798.

The defendant pleaded several pleas, among which were the general issue, and a justification under a grant from Whitall.

Whitall, by a deed of conveyance executed by himself and wife, dated December 4th, 1818, acknowledged the same day, and duly recorded April 8th, 1819, granted, bargained, sold, released and confirmed unto Christian Faunce, his heirs and assigns, for the consideration of $5000, as follows: "All that lot of ground situate, &c., bounded as follows: Beginning at a stone near the river Delaware, thence north, fifty-three degrees twenty-five minutes east, one chain and fifty-nine links; thence north, thirty-six degrees thirty-five minutes west, to low-water mark of the river Delaware; thence along the low-water mark till the same intersects a line running north, thirty-six degrees thirty-five minutes west, to the beginning corner; thence along the said line of south, thirty-six degrees thirty-five minutes east, to the beginning; and in case the high-water mark should encroach upon the said lot, then the southerly line of the same to be extended back so far as to leave eighty feet from the high-water mark and the southerly line, and *also the sole right, privilege, use and enjoyment at all times for all purposes of fishing whatsoever, and for no other purpose*, of the two following lots: The first beginning at the middle of the present sluice in Little Mantua creek, which said beginning bears north, thirty-eight degrees east, from the top northwest corner of James Hopkins' house, and north, eighty degrees fifty minutes west, from the northwest corner of Samuel Whitall's house; thence north, sixty-six degrees forty-five minutes east, two chains and nine links, to the middle of the meadow bank; thence along the middle of the said bank north, thirty-five degrees fifteen minutes east, five chains twenty-five links; thence still along the middle of said bank

north, fifty-six degrees forty-five minutes east, thirteen chains; thence north, fifty-three degrees twenty-five minutes east, four chains thirteen links, to the stone, the beginning of the lot above mentioned; thence along the said lot north, thirty-six degrees twenty-five minutes west, to low-water mark; thence down the low-water mark till the same intersects a line of a due north course from the beginning; thence south to the place of beginning. The second beginning at the end of the first course of the lot first above mentioned; thence north, forty-nine degrees thirty minutes east, nine chains fifteen links; thence south, eighty-seven degrees ten minutes east, five chains; thence north, forty-seven degrees east, eight chains ninety links, to a stone on Benjamin Wilkins' line, bearing north, forty-eight degrees fifty minutes east, from the south chimney of James Hopkins' house, and south, eight degrees east, from the flag-staff at the fort; thence along Benjamin Wilkins' line to the low-water mark of the river Delaware; thence down the low-water mark till the same intersects· a course of south, thirty-six degrees thirty-five minutes east, to the beginning corner; thence south, thirty-six degrees thirty-five minutes east, to the beginning. And also the right and privilege of laying off the nets used on the said ground at the flood fishing as low down the river as a course of south, thirty degrees west, from the lower cabin, which cabin stands        chains fifty links below the beginning corner at the sluice in Little Mantua creek, or as low down as a course.from the said lower cabin to the wreck of the Augusta; and also the right and privilege of laying the nets used during the season of shad and herring fishing to dry on the meadow of the said Samuel Whitall, between the lot first above granted and where the soap-house now stands, the said Samuel Whitall reserving to himself, his heirs and assigns, the right and privilege of laying off the nets used on his lower fishing ground at the ebb fishing for shad and herring as high up the river as a course of north, thirty degrees west, from the upper end of the course above mentioned of north, fifty-six degrees and forty-five minutes east, thirteen

chains. To have and to hold the premises hereby granted unto the only proper use, benefit and behoof . of the said Christian Fauntz, his heirs and assigns forever."

The deed contained a covenant of special warranty by Whitall and his heirs with Faunce, his heirs and assigns, to warrant and forever defend against all persons claiming under the grantor or his heirs.

Whitall, on the 13th of February, 1819, conveyed the upland, containing two hundred and twenty-eight and sixty-two hundredths acres, to William Newbold, by metes and bounds, together with all the mud flats, shores, landings, waters, water-courses, improvements, rights, liberties, privileges, hereditaments and appurtenances, &c., " excepting and reserving the lot of ground and fishery and all other privileges granted and conveyed by the said Samuel Whitall to Christian Faunce by deed dated the 4th day of December, 1818."

William Newbold died in 1828, and William F. Newbold, as his devisee, and by releases from other devisees, became the owner of two hundred and six acres of the lands last mentioned.

William F. Newbold, by a deed to Christian Faunce and others, bearing date November 7th, 1834, conveying to them the lower fishery, released and discharged the right of laying off nets used on the lower fishery, which Samuel Whitall, in his deed to Christian Faunce, of 1818, had reserved to himself. William F. Newbold afterwards, by a deed dated December 29th, 1874, conveyed one hundred and sixty-five and twenty-nine hundredths acres, part of the lands he had acquired under his father's will, and by releases from his co-devisees, to Robert K. Matlock, and Matlock conveyed the same premises to William Fitzgerald, the plaintiff, by a deed dated January 27th, 1876.

Fitzgerald, the plaintiff, on the 10th of March, 1877, obtained from the riparian commissioners a grant of a lease of lands flowed by the tide-waters of the Delaware, and extending out twelve hundred feet to the exterior wharf line established by the riparian commissioners. The grant of the

riparian commissioners embraces all the land under water lying between high-water mark and the exterior line in front of the last two lots described in the deed from Whitall to Christian Faunce of December 4th, 1818. The trespasses complained of were upon the first of these two tracts.

The fishery had been worked before 1818. The Faunces had been taxed for it as a fishery from 1818 or 1819. In 1820 Christian Faunce filed a description of the fishing place in the clerk's office pursuant to the statute. *Rev., p.* 428, § 18. In April, 1881, a description of it was again filed by the then owners.

Daniel Faunce, Jr., the defendant, succeeded to the rights and estate granted and conveyed to Christian Faunce by Whitall, and in virtue of this privity of estate justified the acts complained of as trespasses.

This cause was tried before Justice Parker in the Gloucester county Circuit Court, in which the action was brought, and was removed into this court by writ of error.

Upon submitting the cause to the jury, the court charged as follows:

GENTLEMEN OF THE JURY—This suit is in the form of trespass. The plaintiff in his declaration complains that on the 1st day of April, 1881, and on other days afterwards, up to the time of the commencement of this suit, the defendant, with his workmen, broke and entered the close of the plaintiff, situated in the township of West Deptford, in this county, and committed various acts of trespass thereon as set forth in the declaration, by means of which the plaintiff suffered damages.

The suit is brought to recover damages for a series of alleged trespasses occurring in the months of April and May, in the year 1881. The premises on which the trespasses are charged to have been committed are described in the declaration as part upland, and part land under the tide-waters of the river Delaware, and lie contiguous.

To prove title to the upland, several deeds are put in evidence. It appears that a little before the beginning of the

present century, the farm of plaintiff was part of a larger tract owned by Trent Francis, and that after his death it was conveyed by his widow and executrix to one Samuel Whitall, who subsequently conveyed to one William Newbold. After the death of William Newbold, his devisees quit-claimed to his son, William F. Newbold; he conveyed to Robert K. Matlock, from whom the plaintiff received his deed on the 27th of January, 1876.

Although the description in these deeds calls for low-water mark, in law they conveyed only to high water, for a reason which will hereafter appear.

The other part of the premises, adjoining the upland along high-water mark and running out in the river in front of his farm, the plaintiff claims under what is called a perpetual lease, with the privilege of obtaining an absolute grant at a fixed price. This lease was given to plaintiff by the riparian commissioners on the part of the State of New Jersey, or rather by the state through the commissioners and governor for the time being on the 10th of March, 1877. The description in the lease includes the land flowed by the tide-waters of the Delaware river and Great Mantua creek, beginning at a point in high-water mark of the river in the centre of the road leading from the Crown Point road to the river; thence north, twenty-eight degrees and twenty minutes west, twelve hundred feet, to the exterior wharf line established in the river by the riparian commissioners, and thence down the river, following the exterior wharf line as far as plaintiff's farm extends, and being all the land under the tide-waters of the river in front of plaintiff's farm from high-water mark to said exterior line, excepting only land under water in front of the small upper cabin lot of the Faunces, because plaintiff was not riparian owner of that lot. · This lease was made by the state to the plaintiff as riparian proprietor, under and by virtue of the statutes of the state on that subject. The papers in the cause show that at the time of the lease he was riparian owner. The deeds before mentioned and this lease included the *locus in quo* as described in the declaration, and embrace

all the premises both above and below high-water mark, on which the several trespasses were alleged to have been committed.

That the defendant and his workmen did the acts which the plaintiff charges as trespasses at the time and places alleged within the description of these conveyances and lease, is not denied. The defendant admits that he took down the fence, or directed it done; that he led the horses through on the land inside the bank, and on the bank, whenever it was necessary for the purposes of a fishery to take them to and from the windlasses; that the windlasses were placed permanently in the soil, part on outside and part inside or on the bank, and were kept there year after year, and used by him in 1881; that he and his men used the bank in the prosecution of their business of fishing throughout the season of 1881; that at high water they made hauls and took out the fish near the foot of the bank, and at low water just outside the flats, and occupied the flats included in the plaintiff's lease so far as was necessary.

Now, if defendant had no legal right to do the acts complained of, if neither he nor the persons under whom he was acting had a right of several fishery there, these acts were trespasses for which the true owner of the land should recover damages.

My instructions to you, gentlemen, are, that upon the evidence produced by the plaintiff, and thus far stated by me, the plaintiff was the owner of the *locus in quo*, whether above or below high-water mark, and you will so find unless the defendant has proved a better title or has made out a legal justification of his acts by virtue of a right in himself or those under whom he acted to a several fishery there.

The defendant claims that he had such right and that he has shown it, and is therefore justified in what he did. If this be so, if he has shown such right, he is entitled to your verdict.

If the defendant, in the fishing season of 1881, had the legal right to fish there with as many men as was necessary to operate the fishery to advantage, he was not a trespasser,

unless, in the prosecution of the work, he or those under him, with his command or knowledge, did unnecessary damage or transcended any privilege given them by conveyances from the owner of the upland from whom the alleged fishery came.

Is there proof that defendant or his employes did anything more on the lands of plaintiff than was actually necessary to carry on the business of fishing at the place, or anything more than was authorized by the rights and privileges in conducting the business of fishing there, contained and granted in the deeds from the former owners of the farm? If, in the prosecution of the work there, defendant, either negligently or carelessly or intentionally, damaged the plaintiff unnecessarily and beyond the privileges alleged to have been granted by Whitall on the upland, the jury should find for plaintiff the amount of such damages, whatever may be the law as to the right of the defendant within the bounds of the lease from the state.

Of course if defendant had no right of several fishery at all he is liable for all his acts of trespass. If he had a right of several fishery he is only responsible for unnecessary damage or damages committed in excess of the rights granted to Christian Faunce by Whitall on the upland. This is a question for the jury.

The real question in this cause is, Had the defendant, or those under whom he was operating a fishery there in 1881, a right of several fishery in that pool? If they had not, defendant is liable for all damages proved; if they had such right of several fishery he would be liable only for damages from unnecessary acts, if any, as are proved; and if none such appear then defendant is entitled to a verdict.

The defendant claims that the persons under whom he operated the fishery had a legal right thereto through deeds from prior owners of the farm, claiming also to be owner of the fishery.

Two conveyances are produced which purport to convey the fishery. The first is dated December 4th, 1818, from Samuel Whitall (who at that time was the owner of plaintiff's

farm) to Christian Faunce. This conveyance, after granting the cabin lot, purported to convey whatever right, privilege, use and enjoyment Whitall had for purposes of fishing, and no other purposes, of premises along on middle of the bank in part lying between Little Mantua creek and the cabin lot, then out in the river to low-water mark, and down the river at low-water mark, with the right and privilege of laying off the nets used on said ground at the flood fishing, and also of laying nets on certain meadow land of Whitall. I may not give the precise language of the deed but its substance. This deed purported to convey a right of several fishery on that shore from the then shore-owner, which subsequently was sought to be perfected by a conveyance from William F. Newbold, a subsequent owner, in 1834, to the Faunces, of the next lower fishery, and a certain right of fishing in this which Whitall had reserved in his deed to Christian Faunce.

To make these deeds from Whitall and from Newbold of any avail to defendant, it should appear that at the time of the execution of the papers these grantors, or one of them, owned a several fishery at the place in question. They could not give title unless they were themselves owners of the right, and the deeds offered by defendant for the fishing right will not justify him unless it shall appear that such right existed in them, or one of them.

By the common law the land-owner had no right beyond high-water mark, and therefore could not, under such law, derive title to a several fishery by deed from the proprietors. It has been decided in this state by the court of last resort, that at common law the State of New Jersey is the absolute owner of land in all navigable waters where the tide ebbs and flows within the territorial limits of the state, and that the state can grant such land to any one to be for his exclusive use. Where, then, did Whitall or Newbold get a right of several fishery, if they had it?

Did the right of several fishery come by prescription to them?

My charge to you is, gentlemen, that neither the Faunces

nor their grantors had title to this alleged several fishery by prescription, use or adverse possession, adverse to the state. It could not be adverse, if, as defendant claims, the right has been continually protected by the state.

But the defendant interposed another ground of defence, which may be thus briefly stated : Admitting that by the common law the riparian owner holds only to high-water mark, and that by the same law the state is the owner absolutely of all the lands under the waters below high-water mark, and may sell her right to whom she pleases, yet that there is a local custom, or local common law in New Jersey, applicable to shore fisheries along the river Delaware, which recognizes the right of property in several fishery, and that this right has been acknowledged and maintained by the legislature and the courts. Consequently it is argued that whatever right the state passed to plaintiff must be subject to this right of several fishery, if there was a fishery there before the giving of the lease. Now this is the important question of this case, in the presence of which all others must sink into insignificance. Very valuable interests depend upon the solution of this question. The shore fisheries on the Jersey side of the Delaware river below the falls at Trenton are of immense value.

There is no question that the legislature of the state has, by repeated acts, intended for the protection of shore fisheries, recognized them as property.

These acts began at a very early day and continued at least in each decade, by new acts or supplements, almost from the time of the acknowledged independence of the state in 1783 to the present time. In and by these acts the claimants of these several fisheries are called owners, and penalties are fixed for invading the pools which they claim in front of their shores, provided they file descriptions thereof, with a bond, in the clerk's office of the county. These fisheries were thought of such importance that in 1783 they entered largely into a treaty between New Jersey and a sister state, on the the other shore, in respect to jurisdiction over the Delaware river, and

the right of guarding the fisheries on the river annexed to the respective shores was thereby guaranteed. In 1799 an act was passed subjecting persons having command of ships and other vessels and craft anchoring on fishing grounds, to a penalty, unless they were removed immediately upon request of the owner or occupier of such fishery, the penalty to be recovered by the owner or occupier.

Acts have been passed almost annually for the last hundred years, providing for the taxing of fisheries. At first the designation in the act was "accustomed fisheries, the property of private persons," and afterwards the word "fisheries" alone was used. Under these acts shore fisheries in the tide-waters of the Delaware have been taxed. This very Faunce fishery, we are told by a witness, has paid tax for over sixty years. Shore fisheries on the Delaware have been conveyed and devised as real estate, and been the subject of partition in our courts from a very early period. Sometimes they passed with the shore, at other times they were detached, but whether united or severed from the shore they were regarded and treated as real property.

The evidence shows this to have been the case from the early part of the eighteenth century.

Having very hastily noticed the current of legislation on the subject of fisheries in the Delaware, and called attention as briefly as possible to the common understanding, not only of the owners but the public and the courts, granting parti-tion or sale of such property upon which the idea of local custom or local common law seems to have been drawn, I will inquire if a local common law in New Jersey in regard to rights of riparian owners on tide waters, differing from the common law of England, has been recognized and affirmed by the courts in this state.

The celebrated case of Gough v. Bell, decided that there was such a thing as local common law in New Jersey. It is true the controversy there was not in reference to fisheries, but in reference to the right to dock out and improve by riparian owner in front of his lands between high and low water.

Fitzgerald v. Faunce.

The common law of England gave the land to the state below high water, but the court held that a local common law authorized the riparian owner to improve in front of his lands below high water, and he could hold them after the improvement, if made before the state, or her grantees, asserted her rights.

In the discussion of counsel, and in the opinions of the judges in that case, it was taken for granted that a local custom or local common law existed in respect to the right of several fishery on the river Delaware, which was used by some of the judges as an evidence that there were changes in this state, in some respects, of the common law, as to rights of riparian owners.

In order to make this subject plainer it will be well to quote some extracts from the opinions of the judges in the case of Gough v. Bell.

Chief Justice Green presided in the Supreme Court when that case was argued, and read an elaborate and carefully prepared opinion. He was one of the ablest jurists this state or the country has produced, and coming from him the extracts I quote have great significance. He says: " Notwithstanding the acknowledged title of the state in her sovereign capacity to the soil of navigable rivers below high-water mark, there has undoubtedly existed from a very early period, rights of the riparian proprietors which have been recognized by the legislature, inconsistent with the idea of that exclusive property in the state, sanctioned by the rule of the common law." Then the Chief Justice mentions several acts of the legislature, to which I have alluded, which recognize the right of property in shore fisheries on the Delaware river, and he then added : " Such repeated and unequivocal legislative recognition of a right furnishes proof of its existence which cannot be disregarded." Chief Justice Green quotes Mr. Griffith (a very able lawyer, residing at Burlington, familiar with titles in West Jersey,) as saying: " This species of property [referring to fisheries] from the earliest times has been the subject of exclusive enjoyment and aliena-

tion like any other." The Chief Justice then further adds :
" This claim, it is clear, is totally irreconcilable with the rules
of the ancient common law touching property in the soil on
shores of navigable rivers, and if the claim rested only on the
principle of the common law in England it cannot be sus-
tained. The right of the riparian proprietors to an exclusive
right of fishery in the tide waters in front of their lands must
rest, it is apprehended, on custom or local usage variant from
the common law. There is, then, I conceive, unquestionably
a local common law affecting the title of riparian proprietors
upon tide-waters, and conferring upon them rights and privi-
leges unknown to the common law of England." In the
Court of Errors and Appeals the decision of the Supreme
Court in Gough v. Bell was affirmed, and the opinion of
Chief Justice Green approved. In the opinion of Judge
Ogden, who was known in East Jersey as a sound lawyer, the
following occurs : " By the common law of England the pro-
prietors of lands bordering on navigable tide-waters had title
to ordinary high-water mark, and the soil beyond that line
was vested exclusively in the crown. Proprietors of such
lands in New Jersey, from a very early period in her history,
have enjoyed for their individual benefit and in private
ownership privileges upon the shore adverse to the exercise of
the sovereignty of the supreme power, excepting when em-
ployed for the protection of the rights of navigation and emi-
nent domain. The origin of such infringement upon the
rules of the common law of England has not been satisfactorily
traced, but its existence has been repeatedly recognized in leg-
islative enactments and its enjoyment has been uninterruptedly
claimed. One exercise of such right, not supported by the
doctrines of the common law of England, regards exclusive
fishery in front of his land." I come now to give some
extracts from the opinion of Judge Elmer, a most remarkable
man, and an extremely able judge, whose ripe experience,
great learning and excellent judgment have been of much
value to New Jersey, in shaping the jurisprudence of the state
on many vital questions. He was a resident of West Jersey

Fitzgerald v. Faunce.

during the whole of his long and honorable career, and he knew what he was writing about when he wrote his opinion in the case of Gough v. Bell, in the Court of Errors and Appeals. He said : " The question is not what was the common law of England, but what is the common law of this state.    That some of the doctrines of the common law have never been considered applicable to our circumstances and never have been adopted here, and that others have been materially changed by our local usages, is not disputed.    We are now to consider whether the rules of the common law, in regard to the ownership of property adjoining the sea or our navigable waters, have been adopted in this state, or whether there is evidence that they never have been in force here, or have been materially changed.    An excellency of the system of common law derived originally from the general custom of the country is that it is not so inflexible as a statute, but may be modified from time to time as circumstances require.    It is conceded," he says, " as well by those who contend for the application of the strict rule of the English common law to the shores of navigable waters in this state, as by those who think we have a local common law on the subject different from that of England, that the owners of the adjoining land in this state have the exclusive right of fishery on such shore."    It was the opinion of Judge Elmer that the right of several fishery in the shore-owner had its origin in the uniform practice of the holder of the upland to extend his exclusive right to the soil beyond high-water mark.    But it matters not how the right originated.    The question which concerns us is, whether the right to several fishery in the shore-owner on the Delaware river existed and does exist.    In the Circuit Court of the United States, Judge Baldwin, a man of acknowledged ability, held the same view, and said in Bennett v. Boggs : " It is admitted that from a very early period of the history of the state shore fisheries have been considered private property, capable of being devised and alienated with or separate from the land to which they are annexed, subject to taxation and taxed as other real estate."    This doctrine so ably set

forth by Chief Justice Green in Gough v. Bell has as late as 1870 been approved by the acute and logical mind of the present Chief Justice of this state, so that it may be and must be now considered as established law that there is a right of fishery, a right of property in fisheries in the shore-owners, and their assigns, on the Delaware river on the Jersey side, and that such right of property has been recognized by the courts. Had Whitall such property in the fishery in question in 1818 when he made the deed thereof to Christian Faunce; or had Newbold a property in the rights and privileges of fishing he granted to the Faunces in 1834; was this fishery one that has been recognized as private property? Was it of the class referred to by those learned judges? It is an ancient fishery going back of the year 1800—how far back of that time is not proved. The description of the pool of this fishery, and accompanying bond, have been filed in the clerk's office almost every year for over sixty years, commencing almost immediately after the law on that subject was passed, and for over sixty years taxes have been annually paid by the owners on this fishery. It has been operated as a fishery every year. Guided by the opinions of the eminent jurists I have named, and adopting their views, I charge you, as matter of law, that under the evidence the defendant, in the spring of 1881, when the trespasses are alleged to have been committed by him, had a right, or those under whom he claimed had a right, of fishery there; that plaintiff held his lease subject to such right of fishery, and the defendant is entitled to your verdict, unless, as I before said, you find he did acts which did damage to the plaintiff that were not necessary to his operating the fishery, or which were outside of and beyond the rights and privileges of fishing granted to Christian Faunce in 1818 and 1834 by the then land-owners. And if he did commit acts in excess of these rights and privileges, your verdict should be for plaintiff in such amount of damages as you find resulted therefrom.

For the plaintiff in error, *D. J. Pancoast* and *P. L. Voorhees.*

The plaintiff in this case is the owner of a very valuable farm on the banks of the Delaware river in West Deptford township, Gloucester county, in this state, and as the grantee of the state he is also the owner of a large extent of flats or lands flowed by tide-water in front of his upland, between which and the flats is a bank which keeps off the tide. The plaintiff below brought an action of trespass against the defendant for occupying and using the plaintiff's river front, including his upland bank and flats, for the purpose of a fishery, in the spring of 1881, which the defendant attempts to justify under a claim of a several fishery entitling him to make such use of plaintiff's premises.

The main question in this case is, whether a several fishery in the navigable tide-waters of the Delaware river can exist without a direct grant from the state by the sanction of the legislature. Our position is that it cannot.

A several fishery implies the exclusive right to catch and take fish in certain waters and must have its origin in the ownership of the soil covered by the waters in which it exists. *Angell on Water-courses,* (7th ed.,) § 73; *Cobb* v. *Davenport,* 3 *Vroom* 384.

The defendant in this case pleaded title to a several fishery in the Delaware river, covering a part of the *locus in quo,* by private grant from a former shore-owner, by prescription or user beyond the memory of man and by adverse possession for more than twenty years.

The court at the trial below held that the title under and by virtue of the grant from the former shore-owner, under which the defendant attempted to justify, was insufficient in law to create the several fishery claimed; that the defendant had no right or title to the same by prescription or user beyond the memory of man; that the defendant had no right or title to the same by adverse possession. But after overruling these principal grounds of title the court below declared that the defendant, and those under whom he claimed, had

title to the several fishery pleaded, by a common law peculiar to the State of New Jersey.

This declaration of law we challenge as erroneous: first, because it is something entirely new and unknown to the English common law; second, because it is unsound in principle; third, because it is unsupported by authority.

The several fishery which the court held belonged to the defendant, and those under whom he claimed, is wholly within the tide-waters of the Delaware river and partly in front of the plaintiff's land. Its extent in the river neither the witnesses of the defendant nor the court attempted to state or define. A six-hundred-fathom net is used to fish it, and at high water the net is drawn up to plaintiff's bank, and at low water it is drawn to the water's edge, some nine hundred feet from the bank, so that the actual sweep of the net embraces a large area of the great river in front of plaintiff's land.

The State of New Jersey extends to the middle of the Delaware river, and the land under it belongs to the state, which succeeded to it as one of the royalties of the Crown of England upon achieving its independence as a state. *Tinicum Fishing Co.* v. *Carter*, 61 *Penna. St.* 35; *McCready* v. *Virginia*, 94 *U. S.* 391.

The right and title of the state to all the lands under tide-waters within its boundaries has been too long decided and acquiesced in to be disputed or disturbed at this time.

Nor is it a doctrine peculiar to this state. It is the doctrine of the common law of England and has received the sanction of the Supreme Court of the United States and many of the courts of individual states wherein the principles of the common law of England are recognized and applied to the settlement of public and private rights.

The sale and disposition of these riparian lands of the state to the shore-owners through the riparian commissioners, under and by virtue of the several acts of our legislature on the subject, has resulted in the enlargement of our public school fund to several millions of dollars, and in view of these facts

it seems to be a bold declaration at this time to say that any person may have or acquire title to any part of the state's land under water without the knowledge or consent of its sovereign owner and contrary to the rules of the English common law.

What is to become of the state's title to these lands if this court sanctions this new doctrine, that they may be taken and held by private individuals under and by virtue of a new common law peculiar to New Jersey?

And this brings us to the inquiry, What is this new common law? What evidence is there of its origin, growth, development and present existence, and how does it get its power to vest a part of the state's land in a private individual without the application of any of the rules or principles of the old common law?

The court at the trial opened wide the door for the defendants to prove the existence of this new common law, and admitted one of the honorable judges of this high court as a witness to testify as an antiquary what he had read and heard about titles to other fisheries on the Delaware river, and what he had heard and read of the traditions relating to the Delaware fisheries, to lay a foundation upon which to rest the new common law, but the court chose finally to rest its judgment of its existence upon the authority of some judicial declarations or *dicta* that are too feeble to support it, as I shall proceed to show in the light of adjudged cases.

But I will first remark that *prima facie* in all matters of property rights the common law of England is the common law of New Jersey, and any innovation or change in the same, whether by positive enactment or other less certain way, must appear in clear and definite form—any doubt or uncertainty must be fatal to it.

In 1812, in *Yard* v. *Carman*, 2 *Penn.* 493, Judge Pennington, in a fishery case, expressed himself strongly to the effect that a several fishery could not exist in the waters of the Delaware river. He used this language: "I am disposed,

however, to take broader ground, lest I may be understood to acquiesce in an authority assumed by certain persons of appropriating to their exclusive use the privilege of taking fish in certain portions of this important river. The exercise of this exclusive right of fishery in the arms of the sea and great rivers was thought by our English ancestors a restraint on their natural rights as odious and more injurious than the game laws."

In 1820, in *Arnold* v. *Mundy*, 1 *Halst.* 1, in relation to the right to an oyster-bed under tide-water, it was held that a several right of fishery cannot exist in a public river without a grant from the sovereign power of the people in whom the title to lands under navigable waters is vested. See the latter part of the opinion of the Chief Justice, in which he sums up his conclusions, pages 77 and 78.

In 1830, in *Bennett* v. *Boggs*, 1 *Baldw.* 60, Judge Baldwin dissented somewhat from the doctrine of Arnold *v.* Mundy and inclined to the opinion that several fisheries existed in the Delaware river independent of any grant from the sovereign.

That case was disapproved in 1842 by *Martin et al.* v. *Waddell*, 16 *Pet.* 367, which involved the title to an oyster-bed under tide-water in this state. The Supreme Court fully considered and approved the doctrine of Arnold *v.* Mundy, not as a binding authority, but solely upon principle, and held "that at least since the *magna charta* the King of England has had no power to grant to a subject a portion of the soil covered by navigable waters so as to give him an immediate and exclusive right of fishery, either for shell fish or floating fish within the limits of the grant. Page 410. And that the land under the navigable waters of New Jersey passed from King Charles to his brother, the Duke of York, the grantee, as one of the royalties incident to the powers of government, and were to be held by him in the same manner and for the same purposes that the navigable waters of England and the soils under them are held by the crown; and that when the people of New Jersey took possession of the reins of government and took into their own hands the powers of

sovereignty the prerogative and royalties which before belonged either to the crown or the parliament became immediately and rightfully vested in the state." Page 416.

The unqualified doctrine of this case is that a several right of fishery cannot exist in a public river like the Delaware without a grant from the sovereign power in whom the title to the land under navigable water·is vested as trustee for the public.

Mr. Justice Thompson dissented from this conclusion, and expressed his view " that by the law of England the king did not hold the lands under navigable waters as trustee in a way that precluded him from granting a several right of fishery in a public river ; that *prima facie* navigable waters are open to all to fish in common ; that a several fishery and a common fishery are utterly incompatible with each other. The former is grounded upon and annexed to the right of the soil, and when that right of soil is acquired by an individual the several fishery begins and the common fishery ends." Page 430.

This case has been followed and approved by the recent case of *McCready* v. *Virginia,* in the same court, 94 *U. S.* 391, which lays down the doctrine " that a state owns all the land under the navigable waters within its jurisdiction and the waters themselves, with the fish in them, so far as they are capable of ownership, and can exclude the citizens of other states from all use of such lands and waters and allow them to be used in common by its own citizens, or may grant the exclusive right to use them to any individual the same as if they were dry, arable land, so long as the rights of navigation are not interfered with."

The next case in New Jersey is *Gough* v. *Bell,* 1 *Zab.* 160, decided in 1847, which held that the legislature might grant away its lands under public waters to private owners. Page 165. And that a grant of the soil under the waters of a fishery is its destruction. Page 160.

This case came before the same court again in 1850 (2 *Zab.* 441), and the doctrine was then laid down that while the state was the owner of all lands under tide-water below high water,

yet where it had suffered the riparian owner in good faith to reclaim parts of it by filling up and wharfing out, he acquired a good title to the land so improved as against the state which permitted it to be done. Judge Randolph, in his opinion, speaking of the rights of the shore-owner, said (page 491): "But if his boundary be on the sea or navigable waters, his rights extend only to high-water mark—his privileges as far as his senses can perceive or appreciate.

"What right has he beyond his boundary? All beyond belongs to the state, and although that may be slow to deprive him of any privilege, yet can it be disputed that the state would have a right to fill up in front of any riparian owner to high-water mark, and erect thereon a fortification or light-house or any other necessary object? And if no land was taken above high water, would any private property be taken for public use, any that the riparian owner must be paid for under the constitution? What is lawful for the state is lawful for its grantee, though it might seem very inexpedient and very unkind for either thus to interfere with valued privileges," &c.

It was *queried* in this case whether the state could, by a grant of the land under water fronting the shore-owner, destroy his adjacency to the water without compensation, and the judges seem to have greatly differed in their views as to just what a shore-owner's rights or privileges to the water were.

This same case came up before the Court of Errors and Appeals in 1852 (3 *Zab.* 624), when the decision of the Supreme Court was affirmed, and three of the judges took occasion to give their sanction to the doctrine that riparian owners on tide-waters have rights and benefits arising from their adjacency to the water, of which they cannot be deprived without compensation.

In *Townsend* v. *Brown*, 4 *Zab.* 85, 86, Chief Justice Green stated, in very strong terms, that there could be no ownership in lands under water below low-water mark, without a legislative grant.

In *State* v. *Jersey City*, 1 *Dutcher* 527, the absolute property of the state in lands between high and low-water mark was affirmed, and it was held that the state could convey such lands without regard to the shore-owner's privileges; and in 1864 the legislature, considering the law to be settled that the state was the owner of all lands under tide-waters within the state, and could dispose of them by grant or lease to private individuals without interfering with the superior rights of navigation, passed the first of a series of acts for the ascertainment and disposition of the rights of the state to lands under water, entitled "An act to ascertain the rights of the state and of riparian owners in the lands lying under the waters of the bay of New York and elsewhere in this state," approved April 11th, 1864; to which there has been added a number of supplements, one of which (*Rev.*, *p.* 985, ¶ 20,) provides that a conveyance or lease by the riparian commissioners "shall vest all the rights of the state in said lands in the lessee or grantee."

And the respective rights of the state and riparian owners for all purposes have been entirely settled and put to rest in this state by our Court of Errors and Appeals in 1870, in the case of *Stevens* v. *Paterson and Newark R. R. Co.*, 5 *Vroom* 532, in which it rejected the *dicta* in Gough v. Bell, and affirmed the absolute title of the state to lands under tide-waters free from all restriction as to its right to convey it to anyone without any compensation to the shore-owner.

There are numerous cases in other states affirming the doctrine and principles herein set forth, and I will simply refer to a few of them.

*Trustees of Brookhaven et al.* v. *Strong*, 60 *N. Y.* 65; *City of Galveston* v. *Menard*, 23 *Tex.* 392; *Tinicum Fishing Co.* v. *Carter*, 61 *Penna. St.* 21; *Musser* v. *Hershey*, 42 *Iowa* 361, 362; *Bailey* v. *Burges*, 11 *R. I.* 330; *Middleton* v. *Pritchard*, 4 *Ill.* 510; *Martin* v. *O'Brien*, 34 *Miss.* 21; *Ward* v. *Willets*, 6 *Jones* (*N. C.*) 183; *Collins* v. *Bendbury*, 3 *Ired.* 277, 5 *Ired.* 118; *Carson* v. *Blazer*, 2 *Binn.* 476; *Shrunk* v. *Presi-*

*dent, &c.,* 14 *Serg.* 81; *Westfalls* v. *Van Auker,* 12 *Johns.* 425; *Whittaker* v. *Burhaus,* 62 *Barb.* 238.

These authorities abundantly establish the propositions of law upon which the plaintiff relies to overthrow the charge of the court below, to the effect that the defendant had a right or title to a several fishery in the Delaware river that was superior to the right or title of the plaintiff to the *locus in quo* under tide-water, derived from the state under and by virtue of his riparian lease.

And briefly stated these propositions are as follows:

*First.* A several fishery must have its origin in the ownership of the soil.

*Second.* The soil under the tide-water of the Delaware river became vested in the state when it achieved its independence.

*Third.* That no title to lands under the water of the Delaware river in this state can be derived, except from a grant by the state under legislative sanction.

*Fourth.* That a right of a several fishery in the waters of that river cannot exist without the same legislative sanction.

And from these four positions necessarily flows the conclusion that the plaintiff, as the state's grantee under and by virtue of his lease, is entitled to the use of the land under water therein described, without being subject to any limitation by a private right of several fishery in the defendant, or those under whom he claims.

Against this conclusion, resulting from the well-settled principles above enumerated, I have now to consider the grounds of the doctrine of the court below. But first I must simply call the attention of the court to the manifest error of the court below in admitting the most uncertain hearsay testimony in relation to other fisheries, to settle and fix the defendant's right to his, and leave the plaintiff to justify it as best he can.

The court below did not pretend that the evidence of the defendant, allowed with such unusual liberality, established the existence of the new common law invoked to give title to the defendant in the several fishery claimed.

Fitzgerald v. Faunce.

It was put upon the statements and reasonings of several of the judges in Gough *v.* Bell, wherein the point to be decided did not relate to a fishery, but was whether the universal custom of riparian owners in this state, ever since the earliest colonial times, to fill up, reclaim and improve lands under water in front of their lands, for wharves and other necessary purposes, without let, hindrance or objection on the part of the state, should be held to operate to give them title to the land so reclaimed and improved for such a necessary purpose.

The universality of such a custom, beginning in the earliest times, and the extent to which it had everywhere been practiced, and the unexpected and disastrous results that would otherwise occur to the many owners of such reclaimed and improved lands, manifestly led the court to stretch, if not absolutely break, the law in order to uphold the titles founded upon such a meritorious and equitable claim ; but while the judges concurred in the result, yet they differed radically in the premises and reasoning that led to it, some of them putting their opinions upon the ground that the riparian owner in that case got his title by virtue of a new common law raised up to meet the exigencies of such cases, while others denied the existence of such ground. For instance, Judge Potts, in his opinion, said (3 *Zab.* 674): "It is argued that there is a common custom or usage on the subject established of sufficient duration and universality to amount to a local common law. I am unable to reach this conclusion. The weight of authority is against it. It has been distinctly held that in this state the rule of the common law remains unaltered."

Much was said in that celebrated case, but the only point decided was that a riparian owner, who had reclaimed land under water by filling in and improving the same as a wharf, without objection from the state, acquired a good title to it, and much of the reasoning by which the different judges reached their respective conclusions, has since been rejected as unsound, and every word that was said in that case in relation

to the existence of several fisheries in the Delaware river was the merest *dictum*, as it seems to me.

Chief Justice Green, in *Gough* v. *Bell*, 2 *Zab.* 463, in his diligent search for tenable ground upon which to support the wharf-owner's title to the land under water which he had reclaimed and improved, introduced the subject of the right of several fisheries in the Delaware to prove the existence of a new flexible local common law in New Jersey affecting the rights of riparian owners, and said (page 463): "This right of fishery, so far at least as it regards the river Delaware, cannot rest upon any actual or supposed proprietary grant. The title of the proprietors of New Jersey never extended beyond low-water mark upon the Delaware. The title of the state previous to the Revolution was limited by that boundary. Nor does it depend upon any statute law of the state conferring the right. The earliest legislation upon the subject of the fisheries in the Delaware recognizes the title of the riparian proprietor as an existing right; nor can the claim rest on prescription.

"If a title by prescription can exist at all in this state, many of these fisheries are of modern origin and cannot be prescribed for.

"This claim, it is clear, is totally irreconcilable with the rules of the ancient common law touching the property in the soil and shores of navigable rivers.

"In *Yard* v. *Carman*, 2 *Penn.* 934, Justice Pennington expressed himself strongly against the existence of an exclusive fishery in the river Delaware as a violation of the principles of the common law.

"If the claim rested for its support alone upon the principles of the common law of England it cannot be sustained. The right of the riparian proprietors to an exclusive right of fishery in the tide-waters of New Jersey in front of their land must rest, it is apprehended, in custom or local usage variant from the common law. There is, then, I conceive, unquestionably, in New Jersey a local common law affecting the title of riparian proprietors upon tide-waters and conferring upon

them rights and privileges unknown to the common law of England."

The Chief Justice proceeded in a very summary way to declare, or rather assume, that several fisheries existed in the Delaware by virtue of a local common law, and then extended the operation of this elastic law to cover the point before him for decision, and what he and the other judges who concurred with his view assumed and said in relation to the existence of several fisheries ought to have little weight with this court, unless their reasoning is satisfactory, and I submit that it is not.

Gough v. Bell properly decided and settled only this point, that a riparian owner who had been suffered to reclaim land under tide-water in front of his land by filling it in and erecting a wharf on it was entitled to hold it as against the state and its grantee. The court in that case was not called upon to consider or decide anything in relation to the existence of several fisheries.

Afterwards the Supreme Court, in State v. Jersey City, rejected the loose *dicta* on riparian rights thrown out by several of the judges in Gough v. Bell, to the effect that the shore-owner had rights to the lands under water which the state could not take or divest without compensation, and Judge Elmer, who delivered the opinion, said (page 527): "It must now be accepted as the established law in New Jersey that the right of the owner of lands bounding on a navigable river extends only to the actual high-water mark, and that all below that mark belongs to the state. The inchoate right, if such it may be called, which the proprietor of the upland has either with or without a license to acquire an exclusive right to the property by wharfing out or otherwise improving the same, gives him no property in the land while it remains under the water.

"It may be granted to a stranger at any time before it is actually reclaimed and annexed to the upland. Such is unquestionably the common law, and I am aware of no alteration of it in this respect in New Jersey. Some of the judges seem

to have expressed a different opinion in the case of Bell *v.* Gough before the Court of Errors, but no case has been decided which establishes a different doctrine.  In that manner I concur myself with the opinion expressed by Judge Randolph."

And it is manifest that the remarks of the different judges in that case, as to the existence of several fisheries in the Delaware, were entirely unnecessary and can have no force as authority, and whether several fisheries do exist in the Delaware river remains to be decided upon authority and principle, both of which it seems to me are greatly against the contention that they do.

How far is this new doctrine of title by custom to be extended to establish titles commencing in mistake or error?  It is clear that there must be some limit to it.  If a long-continued and universal custom is to be extended as a lawful means of acquiring title to the state's property I think her property is in great jeopardy.

Private individuals are quick to perceive and defend any invasions of their own rights, but they are slow to defend encroachments on the rights of the state, and while our courts may be willing to sanction and validate such innocent encroachments as the actual reclamation of the state's land under water without objection, yet they may well hesitate to apply the same rule to unreclaimed waters, and say that because it has been the long-continued custom of shore fishermen to claim to own certain portions of the Delaware river as a fishery, they shall have and enjoy it to the exclusion of all other citizens of the state.  The logical result of the extension of this doctrine must be to declare that the state has no property rights in or under the waters of the Delaware, because it has been the general custom of riparian owners in this state to consider and treat the lands in front of them to low-water mark as their own property, until lately undeceived by the decisions of our courts, ratified by the acts of our legislature on this subject.

Judge Randolph, in *Gough* v. *Bell*, 2 *Zab.* 490, said " that

prior to the decision of Arnold v. Munday it was the impression that the entire bed of the river Delaware was private property."

In *Wooley* v. *Campbell*, 8 *Vroom* 164, the Supreme Court affirmed the absolute right of the state to dispose of its lands under water as against the common right of fishery in waters covering the land. And if the right of common fishery in all the people, universally exercised from time immemorial, may be taken away by a grant by the state, upon what just principle can the private right of one man or a few men, exercised for a shorter period of time, be upheld against the grant of the state?

If a usage of one man or a few men to fish in a particular place in a public river is to give him or them a vested right, ought not the same rule to give the whole people in common a vested right to do the same or a similar thing?

I quite agree with the views of Judge Pennington, that the existence of the right of a several fishery in the arms of the sea and in our great navigable rivers is contrary to public policy and the genius of our free institutions. Ought not such waters to be as open to the public to fish as to navigate? *Carson* v. *Blazer*, 2 *Binn.* 476, 485, &c., held that the owner of lands on the banks of the Susquehanna has no exclusive right of fishery immediately in front of his lands, but that the right to fisheries in that river is vested in the state and open to all.

The Supreme Court of North Carolina has denied the existence of several fisheries in the Albemarle sound, and held upon common law principles that they could only be created by express legislative grant, and that from mere user no such grant would be implied. *Collins* v. *Benbury*, 3 *Ired.* 277, 5 *Ired.* 118.

It is said that the state has for a long time recognized the existence of several fisheries in the Delaware, but I deny that the state has ever granted or attempted to grant or even recognized the existence of a private right of fishery existing wholly within the tide-waters of the Delaware like the one claimed

in this case. Shore fisheries have existed along the banks of the Delaware the same as they have existed along the shores of the sea ever since the first settlement of the country, and they have been recognized and regulated by law, but they have been connected with and depended upon the ownership of the shore, and derived their value not from any exclusive right in the water but from the exclusive right to draw the nets upon the shore; and to such fisheries I maintain our legislation has always referred.

Judge Baldwin, in *Bennett* v. *Boggs*, 1 *Bald.* 70, in construing the terms of our statutes regulating our fisheries on the Delaware, said: "The words 'fishery, pool or fishing place,' as defined by the act of 1808, can apply only to a place on the shore to which a fishery is annexed."

In *Gough* v. *Bell*, 2 *Zab.* 490, Judge Randolph, whose views were subsequently approved by Judge Elmer and the Supreme Court in State *v.* Jersey City, said: "It has been urged that the right of fishery which exists in the Delaware, and perhaps some other rivers in the state, and the sanction which has been given them by the legislature, and also the legislative acts for the protection of low meadows sometimes covered by the tide, afforded at least a persuasive evidence of the existence of a rule different from that of the common law. After a very full consideration I am unable to give the argument the weight which is claimed for it; so far as it applies to the Delaware it may be embraced in the considerations already stated; in regard to the whole matter, the very fact that the authority of the legislature was constantly invoked, would seem to raise a doubt of the general or special common law authority.

"But although the right of fishery, like the right of way or the right of common, may be severed from the farm or manor, and any appropriate suit or action may be brought respecting it, yet it is dependent on the upland for its existence, and does not in fact exist, in gross or by any common law rule, detached from and independent of the land." *Shrunk* v. *President,* 14 *Serg. & R.* 81, held that the fisheries on the

Delaware referred to in the statutes are shore fisheries connected with the upland. And in *Westfalls* v. *Van Auker*, 12 *Johns.* 425, it was assumed there could be no several fishery in the Delaware disconnected from the shore.

Contemplate for a moment the significance of the exclusive right of the defendant and others claiming several fisheries as against the state and all its inhabitants to fish in the best parts of the Delaware river with nets that at each sweep—at every haul—cover an area of at least one square mile, and then it will be pertinent to inquire if our people, through their representatives in the legislature, have for many years been wittingly sanctioning such monstrous encroachments upon their common rights, and are now fostering such monopolies by the aid of our fish commissioners appointed by law to multiply fish to be caught in such private fisheries.

There is another view to take of this right of several fishery claimed in this case; the defendant at the trial rested his claim to it under and by virtue of certain private grants that the court declared inoperative and void. Did not his right of fishery fail with the failure of the title under which he held, and is he not in a position with every presumption against any other and better origin to his claim?

In *Commonwealth* v. *Alburger*, 1 *Whart.* 488, Sergeant, J., said, in relation to a claim against common rights: "There is no room for presumption since the grant itself is shown and proves defective." Courts do not favor presumptions against common right. *Collins* v. *Benbury*, 3 *Ired.* 277, 283, 284, 5 *Ired.* 118, 124.

The grants offered by defendant in support of his claim being defective, and there being no presumptions to favor his title, it must stand or fall upon the proofs showing a user under claim of right of fifty or sixty years without anything to make it adverse to the state.

The Supreme Court of Massachusetts, in *Lakeman* v. *Burnham*, 7 *Gray* 440, speaking upon the subject of title by adverse possession against the state of lands under water, said: "Perhaps in the absence of an express legislative grant one

might be proved by adverse use and enjoyment, but it must amount to that degree of exclusive occupation sufficient to raise a belief that such act or resolve had actually been passed though not appearing, and in general this can only be done by showing actual possession of the flats where the tide ebbs and flows by building thereon or inclosing the same so as to exclude the access of boats and vessels." *Whittaker* v. *Burhaus*, 62 *Barb.* 238, was an action similar to this, in which the owner of certain flats flowed by tide-water brought his action of trespass for damages against fishermen accustomed to use them for many years, and succeeded on the strength of his title to the flats, derived from the Crown of Great Britain against their defence, made under a plea of a common right of fishery in the *locus in quo* exercised for a long period.

My conclusion is that the state never lost its title to the land under water in which the defendant claims a right of several fishery, and that he acquired no right or title to the same as against the state or the plaintiffs if granted by virtue of any usage or local common law, and that the charge of the court on this point was erroneous.

Having fully discussed the principal question in dispute between the parties I will now very briefly call attention to some of the exceptions to rulings of the court below upon minor points.

The plaintiff offered to prove that the defendant wantonly spoiled his fence rails on the *locus in quo* by putting filth upon them to render them unfit for future use. In any view of the case such conduct was a wanton and unjustifiable trespass; but the court forbade the plaintiff to show that fact and excluded the evidence he offered of it, and allowed the defendant against the objection of the plaintiff to prove that he removed the rails by the advice of counsel.

The river bank defended a large part of plaintiff's farm from overflow and destruction by the water; and this was an important fact for him to show in order to give the jury to understand what care the defendant should have exercised in

the use of the bank with his horses and men, in view of the fact that a very little injury or misuse of it would expose defendant's farm to great damage; but the plaintiff's offer to show this important fact was overruled.

The court allowed the defendant, against the objection of the plaintiff, to prove what is necessary to be done in the preparation of fishing grounds for operation.

It allowed the defendant, against the objection of the plaintiff, to prove that it was not usual to work a fishery without a windlass.

It allowed the defendant, against the objection of the plaintiff, to prove that other fisheries along the Delaware were fished by men who claimed to own them without or disconnected from the upland.

It allowed the defendant, against the objection of the plaintiff, to prove by repute and tradition alleged facts in relation to other fisheries along the Delaware river.

It allowed the defendant, against the objection of the plaintiff, to offer in evidence a letter from Ann Frances to one Clark.

It refused to permit the plaintiff on cross-examination to ask Christian E. Faunce, one of the claimants of the several fishery in question, whether his family claimed it under and by virtue of the deeds offered in evidence or otherwise.

It permitted the defendant, against the objection of the plaintiff, to offer in evidence copies of deeds and wills, in no wise connected with the fishery in dispute, for the purpose of showing how other fisheries along the Delaware shore had been dealt with.

It seems to me that the court below, in its search for evidence of the existence of a local common law giving title to the defendant in the several fishery claimed, entirely overlooked and transgressed the well-settled rules of evidence and principles of law in the particulars above set forth, and that the judgment below ought to be reversed.

For the defendant in error, *M. P. Grey* and *S. H. Grey.*

I. That he and those under whom he claims are riparian owners of the *locus in quo,* a strip of land lying between Fitzgerald's farm and mean high-water mark of Delaware river. See Whitall's deed to Christian Faunce. The description calls for "middle of bank." Three feet wide at top, five feet high. ˙Ordinary high-tide water comes about three feet up the bank. Fitzgerald says ordinary high water comes two to three feet. Extra high, within two feet of top of bank.

The grant is in fee as to quantity of estate conveyed; the limitation is as to the use to which grantee shall put it, *i. e.,* all purposes of fishing. *McKelway* v. *Seymour,* 5 *Dutcher* 321, 329, 332; *Central R. R.* v. *Valentine,* 5 *Dutcher* 567; *Rex* v. *Old Arlesford,* 1 *T. R.* 358. The renting the fishing of a pond held to gain a settlement Buller, J., said the fact of letting a fishery is enough; we must presume the soil passed with it. Ashurst, J., said "a fishery is a tenement." Trespass will lie for it; it may be recovered in ejectment. In *Rex* v. *Ellis,* 1 *M. & S.* 655, Ellenborough, J., said right of soil passed by a grant of " one-fourth part of all those fishings of the halves and halvendoles due and accustomed within the river Severn." In *Gipps* v. *Woollicott, Holt's Cas.* 323, Holt, C. J., held that by grant of the fishery the soil passes.

The reservation by Whitall of right to lay off nets as far up as cabin lot, &c., excludes any other reservation in the premises granted. *Expressio unius, &c., exclusio alterius.*

Fitzgerald had notice of this conveyance by the recitals in his own deed. 2 *Washb. R. P.* 595; *Allen* v. *Bates,* 6 *Pick.* 460; *Foss* v. *Crisp,* 20 *Pick.* 121; *Boon* v. *Pierpont,* 1 *Stew.* 7.

Faunces, if they owned the *bank,* are *shore*-owners under the Riparian act; entitled to notice. *Rev., Riparian act, p.* 984, § 8.

This notice is a *condition precedent* to a grant to any one

else than, and is for the benefit of the riparian proprietor. The want of it is a defence at law in the proprietor of *ripa* against the grant. Judge Depue in *Larned* v. *American Dock Co., Pamph., pp.* 11, 12, on issue sent down from chancery.

No notice shown to have been given Faunce.

Fitzgerald's riparian grant is therefore void as to Faunces.

Same argument applicable if the grant to Faunces is held to be an easement only. It is specifically such a grant to them as makes them riparian proprietors under the act, to such an extent that Fitzgerald, who took his deed subject to their easement, cannot discharge his land of its obligation without the notice to them, because he is not sole and exclusive riparian proprietor. Faunces own the dominant estate, and that having by far the greatest value.

II. The lands fronting on the Delaware river at the *locus in quo* are not within the Riparian act.

It appears in the case that these lands, in a condition of nature, were subject to the overflow of tide-water. Many years ago a bank was erected, the tide was excluded, the land was thus *reclaimed* and improved. See deed, Whitall to Faunce, December 4th, 1818. See testimony of Christian R. Faunce.

By section 8 of Riparian act, 1869: If any person shall desire to obtain grant for lands under water, *which have not been improved* and are not authorized to be improved, &c., it shall be lawful, &c.

The *locus in quo* having been *improved* by the exclusion of tide-water for more than fifty years before the Riparian act was passed, was not within its operation.

III. There may be a several fishery separate from ownership of the shore or soil at common law; strictly speaking, a several fishery has no existence when owned and exercised by the owner of the whole estate; it remains merged in the general use and enjoyment. The road of an owner over his own land would not be called "a right of way." But when

it is held by another it becomes for the first time *several*, a separate and exclusive right in another, a service imposed on the estate.

In *Seymour* v. *Courtney*, 5 *Burr.* 2816, there was a grant of a fishery, with exceptions of right to grantor to take fish for his own table.   Held that grantor intended to pass everything necessary to convey a several fishery.   (A several fishery is where no others have a co-extensive right.   Lord Mansfield.)

*Holford* v. *Bailey*, 8 *Q. B.* 1000.   The question was definitely decided.   Trespass *quare clausum fregit* that defendant entered *sole* and *exclusive* fishery of plaintiff and disturbed his fish.   Defence that trespass would not lie for injury to several fishery on soil of a third person.   Court inclined to think it would lie, but said *sole* and *exclusive* fishery was not equivalent to *several* fishery, and arrested judgment.   But on error judgment was reversed; *sole* and *exclusive* were considered equivalent to *several* in respect of the right of fishery, at least after verdict, and the whole court agreed that trespass would lie though no fish were taken.   13 *Q. B.* 426.

Right of fishing is *prima facie* exclusive in owner of soil as part of inheritance, yet *it is not inseparable from the soil* but may be acquired distinct from the ownership of the soil by grant or prescription.   Such grant may confer upon the grantee a right of fishing exclusive of the owner of the soil *whereby a several fishery is granted,* or may be a license for him to fish in common with the owners and others whereby a common fishery is created.   *Cobb* v. *Davenport*, 3 *Vroom* 384, citing cases.

Weight of authority is that there may be a severance of fishery by the owner separating it from the soil.   *Hart* v. *Hill*, 1 *Whart.* 124; *Smith* v. *Kemp*, 2 *Salk.* 637.

In *Somerset* v. *Fogwell*, 5 *B. & C.* 875, title by prescription to a several fishery sustained in 1826, on proof by paper title only to time of Edward VI., and by collecting rents from 1765 to 1825, a period of only fifty years.   Held to be prescription from time beyond legal memory.   Title by pre-

scription presumed to several fishery after twenty years' uninterrupted exclusive enjoyment. *Angell on Water-courses*, § 67 *and notes; Melvin* v. *Whiting*, 13 *Pick.* 184.

IV. The State of New Jersey, by the exercise of its sovereign power in the treaty with Pennsylvania, 1783; by its local common law ascertained by its history; by the action of its legislature in the exercise of its taxing power; by its direct legislative enactments regarding such fisheries, and by the decisions of its courts, has recognized and maintained the existence of a several right of fishery in the shad fisheries on the Jersey shore of the Delaware river, and protected the owners of such fisheries in the exclusive enjoyment of them as private property.

. *a.* The recognition of private property in the shad fisheries of the Delaware river on the Jersey shore, by the State of New Jersey, in treaty with the State of Pennsylvania in 1783 (before the adoption of the present constitution of the United States), may be found in "An act to ratify and confirm an agreement made between commissioners," &c., passed May 27th, 1783. *Rev.* 1877, *pp.* 1181, 1182. It declares—

*First.* That the river Delaware      *      *      *      is and shall continue to be and remain a common highway, equally free and open for the use, benefit and advantage of the said contracting parties; *provided, nevertheless,* that each of the legislatures of said states shall hold and exercise the right of regulating and guarding the fisheries on the said river Delaware annexed to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted, during the season of catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under claim of a common right in said river.

*Fourthly.* "This present agreement, and every article and clause therein contained," when ratified by both states, "be considered as a joint compact between the said states and the citizens thereof respectively, and be forever irrevocable by either of said contracting parties without the concurrence of the other."

Fitzgerald v. Faunce.

*b.* The taxability of fisheries as private property is shown by an uninterrupted course of legislation since 1779, as will appear by reference to tax laws.

1. The first specific taxation of fisheries, *eo nomine*, which is to be found in the statutes of New Jersey, is an act passed June 8th, 1779—not quite three years after the Declaration of Independence, and some four years before the close of the Revolutionary war—entitled "An act to raise the sum of £1,000,000 in the State of New Jersey." 4 *Pamph. L.* 1779–1784, *p.* 308 ; *Sess. L.* 1779, *ch.* 30, *p.* 70. In this act, among the enumerated taxable items of private property, fisheries are specifically taxed as follows, to wit : "All accustomed fisheries, the property of a private person, where fish are caught for sale, shall be rated, at the discretion of the assessors and chosen freeholders, at any sum not exceeding £500." In the then usual form of the assessors' duplicate in this act the item "fisheries" first appears.

2. In the tax act passed for 1780 the fisheries are taxed in the same language. 4 *Pamph. L.* 1780, *p.* 381 ; *Sess. L., p.* 3, (passed December 18th, 1779, at Mount Holly.)

3. In tax act for 1781 fisheries are taxed in same language, except for the ratable *ad valorem* tax a specific one, in the following language, is substituted : "All accustomed fisheries, the property of a private person, where fish are caught for sale, any sum not exceeding £30." 4 *Pamph. L.* 1781, *p.* 603 ; *Sess. L., p.* 90, (passed June 21st, 1781.)

4. In a war tax to raise £3,000,375, passed December 18th, 1779, the fisheries are taxed in the same language as in the act for 1781. *Pamph. L., p.* 381 ; *Sess. L., p.* 3.

5. In a tax act passed December 26th, 1781, the language is the same as that of December 21st, 1781. *Pamph. L., p.* 689. Tax act of June 22d, 1782, same as that of 1781. *Pamph. L., p.* 739. Tax act of June 9th, 1783, same as that of 1781. *Pamph. L., p.* 32. Tax act of    1784, same as that of 1781. *Pamph. L., p.* 179. Tax act of November 26th, 1785, same as that of 1781. *Pamph. L, p.* 218. Tax act of    1786, same as that of 1781. *Pamph. L., p.*

366. Tax act of June 7th, 1787, same as that of 1781. *Pamph. L., p.* 431.

6. There was a general tax law, entitled "An act to direct the mode of levying taxes, and to enforce the payment of the same," passed March 23d, 1786, (*Pamph. L., p.* 269,) which produced a change in the way of making up the assessors' duplicates of taxable property. The preamble to it recites that "there is not at present, in this state, any general tax system to direct assessors and collectors and other officers employed in the assessment and collection of taxes; and it being both tedious and expensive to point out and ascertain in every law for the raising of money, for remedy, whereof," &c. It then provides, in substance, in the third section, that assessors shall, in the months of July and August of each year, "make exact lists of the persons, estates and effects, made taxable in that year, by any law in force," by which statement or account of ratables, all assessments for one year thereafter shall be made. *Pamph. L.* 1786, *p.* 269.

This act was repealed by a substitute for it, more carefully prepared, and passed June 5th, 1787. The mode of making up the duplicates of ratables was continued, and was, in substance, incorporated by Judge Paterson in his tax act of June 10th, 1799, and has been continued down to the present time. *Pamph. L.* 1786, *pp.* 412–422; *Pat. L., pp.* 404–410; *Rev.* 1877, *pp.* 1140, 1141, §§ 1–6.

After the passage of the act of June 5th, 1787, the annual tax acts, generally, directed that the money to be raised should be assessed, levied and raised in the mode prescribed in the act passed June 5th, 1787. But in some of these tax acts the old form of duplicates was prescribed; and then the old phraseology of taxing fisheries was incorporated in the duplicates.

7. The tax act of November 6th, 1787, simply directs that the money shall be assessed, &c., as prescribed in the act of June 5th, 1787. *Pamph. L. of* 1787, *p.* 446. In the tax act of November 28th, 1788, the direction is the same. *Pamph. L.*

1788, *p.* 492. The tax act of December 1st, 1789, is the same. *Pamph. L., p.* 570.

8. In the tax act of June 12th, 1790, a table of ratable property is specifically inserted, and among the taxable items of property is that of "all accustomed fisheries, the property of private persons, where fish are caught for sale, any sum not exceeding £5." *Pamph. L.* 1790, *pp.* 611–616. The tax act of November 25th, 1790, simply directs the money to be assessed, &c., according to the acts of June 5th, 1787. *Pamph. L.* 1790, *p.* 704, § 4. The tax act of November 22d, 1791, refers simply to the act of June 5th, 1787. *Pamph. L.* 1791, *p.* 728, § 4. The tax act of November, 1792, the same. *Pamph. L., p.* 791. The tax act of 1793 the same. *Pamph. L., p.* 897.

The tax act of February, 1794, has a table of taxable items of property ; among the items is the old form of the tax on fisheries. "All accustomed fisheries, the property of private persons, where fish are caught for sale, any sum not exceeding £2 10s." *Pamph. L.* 1794, *p.* 897. The tax act of December 1st, 1794, (for the year 1795), simply refers to the act of June 5th, 1787. *Pamph. L.* 1795, *p.* 964. The tax act of November 11th, 1795, (for the year 1796), the same. *Pamph. L.* 1796, *p.* 4. The tax act of February 8th, 1797, simply refers to act of June 5th, 1787. *Pamph. L.* 1797, *p.* 152.

10. On the 10th of June, 1799, a general tax law, entitled "An act concerning taxes" was passed as a substitute for the general tax act of June 5th, 1787, and made the same provisions for assessors' duplicates and abstracts of taxable real and personal estate instead of a yearly statutory duplicate. By this act that of June 5th, 1787, was repealed. See act of 1799, (*Pat. L., pp.* 404–410,) and corresponding "Act concerning taxes," in *Rev.* 1877, *pp.* 1139–1148, and it is referred to in subsequent annual tax bills instead of the act of June 5th, 1787.

11. There was an act passed in 1801, entitled "An act designating the taxable property within the State of New Jersey." *Pamph. L.* 1801, *p.* 93; *Rev. L.* 1820, *p.* 511. While

the act of 1801, designating taxable property, does not seem to have been expressly repealed, yet it does not appear to be in force by being printed in any of the Revisions, except that of 1820. Not in Revision of 1846. There is a preamble to it in the following words, to wit: " Whereas, there is no existing law designating the taxable property within this state, in order that the legislature may be possessed of a true return of said taxable property whereon to levy any future taxes, whenever the same may be necessary for the use of the state." It then enacts, in substance, that the assessors of each county shall, in making their assessments, duplicates and abstracts of taxables as provided in the "Act concerning taxes," June 10th, 1799, take a list of the following articles and things, &c.: "All houses and lots, all single men and horses, all single men slaves, covering horses, horses or mules, neat cattle, shop-keepers, tan-yards, fisheries, saw-mills, grist-mills, fulling-mills, furnaces, forges, rolling and slitting-mills, ferries and bridges." Here it will be observed that " fisheries " are regarded as in all respects like other property subject to taxation in the hands of its owner.

12. In the tax act passed November 20th, 1801, to raise $30,000 for the year 1802, it directs that sum to " be assessed, levied and raised " on the taxable property enumerated in the act of March 9th, 1801, adopting, in exact language, the list of taxables contained in that act. *Pamph. L.* 1801–1806, *pp.* 106, 107.

13. In the tax act to raise $15,000 for 1803, it requires it to be assessed, &c., according to the "Act concerning taxes," which had been passed, as above stated, on June 10th, 1799, as a substitute for that which had been passed June 5th, 1787. This act for 1803 contains a detailed list of taxable articles, one of which is "All fisheries where fish are caught for sale, any sum not exceeding $2 50," omitting the word " accustomed " as an adjective to fisheries; and also the words " the property of private persons." *Pamph. L.* 1802, *pp.* 161–166. The tax act for 1805 is the same as that for 1803, except that the amount of tax is limited to $10 instead of

$2.50. Sum to· be raised, $25,000. *Pamph. L.* 1800–1806, *p.* 467. Tax act for 1806 to raise $25,000, same as that for 1805. *Pamph. L.* 1800–1806, *p.* 692. Tax act to raise $25,000 for 1807, same as that for 1801, except that the list of ratables is omitted. *Pamph. L.* 1800–1806, *p.* 735. Tax act to raise $25,000 for 1809, containing a list of taxables, of which is the item of "All fisheries where fish are caught for sale," &c. *Pamph. L.* 1808–1812, *p.* 114. Tax act ·to raise $25,000 for 1810 the same as that of 1809. *Pamph. L.* 1808–1812, *p.* 158. Tax act to raise $25,000 for 1811, same as that for 1809, except without list of taxable property ; but in lieu is required to be assessed according to the tax act of June 10th, 1799. *Pamph. L.* 1808–1812, *p.* 296. Tax act to raise $20,000 for 1812 has a list of taxable property, one item of which is, "All fisheries where fish are caught for sale," &c. *Pamph. L.* 1808–1812, *p.* ·17, towards end of volume. Tax act to raise $20,000 for 1813, same as that of 1812. *Pamph. L.* 1812–1814, *p.* 24. · Tax act to raise $60,000 for 1814, as the usual list of taxables, of which is the one of "All fisheries where fish are caught for sale," &c. *Pamph. L.* 1812–1814, *p.* 231. Tax act to raise the sum of $30,000 for 1816, has the fishing item same as in that of 1814, "All fish-· . eries where fish are caught for sale," &c. *Pamph. L.* 1816, *p.* 43, &c. Tax act to raise $30,000 for 1818 has a list of taxable property to be taxed, among which is the usual item of "All fisheries," &c. *Pamph. L.* 1818, *p.* 102. Tax act to raise $30,000 for 1819, same as 1818. *Pamph. L.* 1819, *p.* 67. Tax act to raise $30,000 for 1820, same as 1819. *Pamph. L.* 1820, *p.* 126. Tax act to raise $10,000 for 1822, same as for 1820. *Pamph. L.* 1821, *p.* 34. Tax act to raise $10,000 for 1823, same as for 1822. *Pamph. L.* 1822, *p.* 99. Tax act to raise $15,000 for 1824, same as for 1823—passed December, 1823. *Pamph. L.* 1823, *p.* 176. Tax act for 1825 to raise $20,000, specifically taxes " all fisheries where fish are caught for sale, any sum not exceeding $8." *Pamph. L.*, *p.* 113. Tax act to raise $20,000 for 1826, same as for 1825. *Pamph. L. p.* 92. Tax act to raise $30,000 for 1827,

same as 1825; amount of tax, $10. *Pamph. L., p.* 64. Tax act to raise $30,000 for 1828, same as 1825; tax, $100. *Pamph. L., p.* 173. Tax act to raise $40,000 for 1829, same as 1825; tax, $10. *Pamph. L., p.* 27. Tax act to raise $40,000 for 1830, same as 1825. *Pamph. L., p.* 124. Tax act to raise $40,000 for 1831, same as 1825. *Pamph. L., p.* 149. Tax act to raise $40,000 for 1832, same as 1825. *Pamph. L.* 1832, *p.* 158. Tax act to raise $40,000 for 1833, same as 1825. *Pamph. L., p.* 145. Tax act to raise $40,000 for 1834, same as 1825. *Pamph. L., p.* 169. Tax act to raise $40,000 for 1835, same as for 1825. *Pamph. L.* 1835, *p.* 161.

All the annual tax laws from 1834 to 1842, inclusive, (nineteen years), will be now readily found in a compilation of the public statutes of New Jersey by Josiah Harrison, Esq., published in 1843. During that period, and the antecedent period of twenty-three years, extending back to the act of March 9th, 1801, which prescribed a list of taxable property, in which list the fisheries were briefly described as "fisheries," the first annual tax act, after the passage of that act, was passed November 24th, 1802, in which, and the succeeding tax acts, the fisheries were described: "All fisheries where fish are caught for sale." This brings the tax laws up to 1843. *Harr. Comp.* 1843, *pp.* 27, 45, 100, 160, 275, 333, 420, 452, 475.

In 1837 was passed the first general law that required a list of taxable property to be made for the taxation "for township and county purposes." This list, prescribed in this statute, corresponds precisely with the list prescribed in the act of 1801 for "state" purposes; thereby creating a harmony in the taxation of property for all purposes. The language of this act, as to fisheries: "All fisheries where fish are caught for sale," passed March 15th, 1837. *Harr. Comp. p.* 160.

In tax act for 1844, to raise $40,000, the fishery item is: "All fisheries where fish are caught for sale, any sum," &c. *Pamph. L.* 1844, *p.* 259. In tax act, 1845, to raise $40,000,

same as 1844. *Pamph. L., p.* 267. Tax act of 1846, to raise $40,000, same as 1844. *Pamph. L , p.* 158. Tax act of 1847, to raise $20,000, same as 1844. *Pamph. L., p.* 177. Tax act of 1848, for county and township purposes, same as 1847. *Pamph. L., p.* 227. This is a general act, entitled "An act respecting taxes for county and township purposes," and enacts that for such purposes the assessors "shall assess and rate the same persons, articles, and in the same manner * * * specified in the act approved March 4th, 1847," to raise a tax for $20,000 ; by which act "all fisheries where fish are caught for sale," are taxed, &c. The tax for 1848 was under this act, which, unlike the yearly tax acts, has not list of rates to it.

The tax for 1849 was therefore assessed, levied and raised under the act of March 9th, 1848, as prescribed by the act of March 4th, 1847. *Pamph. L.* 1847, *p.* 177 ; *Id.* 1848, *p.* 227. The tax for 1850 was the same.

By a supplement to the "Act concerning taxes," it was enacted that in the future "a poll tax of fifty cents should be assessed" upon every white male inhabitant of this state of the age of "twenty-one years and upwards;" and that all real estate and personal estate should be assessed according to its actual value; and "that the term 'real estate,' as used in this act, shall be construed to include all lands, &c., and all mines, quarries and all fisheries." Taxes for 1851 were assessed under this act. This act treats all fisheries as real estate, and as such subject to taxation in the hands of the owner. *Pamph. L.* 1851, *p.* 271.

The above supplement to "Act concerning taxes," passed in 1851, was repealed by a further supplement as a substitute for it, approved March 5th, 1853. The poll tax of fifty cents, and the tax on "fisheries" were continued in substantially the same words as the act of 1851. Under this supplement the tax on "fisheries" was continued. *Pamph. L.* 1853, *pp.* 326–332.

Under the act of 1854 the tax on fisheries was specifically continued, to wit, that the term "real estate" should be con-

strued to mean "all mines, quarries and fisheries." Under this act of 1854 fisheries were taxed as real estate. *Pamph. L.* 1854, *pp.* 296–301.

Under this act of 1854 the fisheries were annually taxed in the years of 1855, 1856, 1857, 1858, 1859, 1860, 1861, 1862, 1863, 1864 and in 1865; and in 1866 a further supplement to the "Act concerning taxes," which increased the poll tax to $1, exempting "volunteers and sailors in the armies of the United States;" but the taxes on "mines, quarries and fisheries" were continued to be taxed as real estate. *Rev., p.* 1150, passed April 11th, 1866.

Under the supplement of April 11th, 1866, (still in force), the annual taxation on fisheries has been continuous from 1866 to 1884. *Rev., p.* 1150.

The above acts show that the legislature of New Jersey, by and under the specific acts referred to, annually taxed the Delaware fisheries as private property of the holders thereof from 1779 to 1884—a period of one hundred and six years, continuously.

No stronger or more convincing evidence of the state's recognition of the right of private property in the fisheries on Delaware river could be adduced. For more than a century the owners of this species of property have contributed to the annual revenues, and the state, by its taxation of these fisheries, intended to and did recognize a right of private property in the owners of fisheries on Delaware river.

It has been repeatedly held that the state's land on the shore in front of a riparian owner cannot be assessed to such riparian owner and taxed as his property. Although he has, as such owner, a license to enter upon and reclaim state's land in front of him, although his adjacency to the shore and rights as licensee greatly enhance the value of his property, yet, until he executes the license by reclamation of shore, or takes a grant of state's title to shore, he cannot be taxed in respect to a property right in the shore.

In State *v.* Jersey City, where the question was as to taxability of land lying below high-water mark, unreclaimed and

unimproved, it was held that such land belonged to the state, and if separately assessed or taxed the assessment was illegal. 1 *Dutcher* 325.

The doctrine of this case is approved of in Court of Errors. *Stevens* v. *R. R.,* 5 *Vroom* 546; *N. Y., L. E. & W. R. R.,* 14 *Vroom* 632.

In the Supreme Court, (*State, Winant, pros.,* v. *Jersey City,* 13 *Vroom* 349,) the court held that land on tide-water, below high-water mark, entirely separate from fast land, the title being in the state, cannot be assessed for taxes.

The courts of the state having thus carefully guarded its rights in the shore before license executed, or grant made, the legislature could not have been insensible to the effect of legislative dealing such as this with Delaware fisheries as taxable property of citizens. It cannot be disputed that this policy of taxation of fisheries was part of the settled policy of the state, and was intended to remove, and did remove, all distinctions between several fisheries and other real estate as to susceptibility for private ownership, which might otherwise have been asserted in respect to several fisheries annexed to the shore of Delaware river.

c. Laws of New Jersey (other than tax laws) protecting and recognizing property in fisheries on the Delaware river.

An act to regulate the fisheries and to prevent the obstruction of the navigation in the river Delaware. Passed December 24th, 1784. Referred to as repealed. *Pat. L., p.* 418.

Amendment to above act, passed November 23d, 1785. Referred to as repealed. *Pat. L., p.* 418.

Amendment to first-named act, passed November 25th, 1790. Referred to as repealed. *Pat. L., p.* 418.

Act to revive and continue first-named act, passed March 11th, 1796. Referred to as repealed. *Pat. L., p.* 418.

Act to regulate certain fisheries in river Delaware, passed June 13th, 1799. *Pat. L., p.* 416.

Section 1. Appointing commissioners with power to license erection of weir or fishing dam (*by consent of owner of adjoin-*

*ing land*), between falls of Trenton and mouth of Machaco-mack river, for term not exceeding five years.

Section 2. Two hundred feet to be left for navigation.

Section 4. Penalty for erecting dam without license, &c., $40 and costs, to go to any informer.

Section 6. Penalty to common informer if overseer refuse.

Section 8. Penalty to common informer for resistance.

Section 9. Recites agreement that New Jersey and Pennsylvania should have exclusive right to protect and guard shore fisheries, &c., and enacts penalty on vessel which shall, in shad season, anchor on fishing ground and not remove on request by owner or occupier of fishery, or wilfully run ashore on fishing ground, of $60 and costs, to be recovered by owner or occupier.

Section 10. Nothing in this act to alter the agreement between New Jersey and Pennsylvania.

Section 14. Repealer of acts of December 24th, 1784; November 23d, 1785; November 25th, 1790; March 11th, 1796. It is to be observed that in that part of above act, imposing a penalty for breach of the law between Trenton falls and Machacomack river, where there are no shore fisheries, penalties go to common informer, but those penalties imposed for intrusion on shore fisheries go to the owner or occupier, obviously intending that the public at large were interested in enforcing and protecting the common right of fishery above Trenton falls, but that the owner of the shore fishery was to be expected to care for his own property and to receive protection by the penalty (not excluding his action for damages), for any intrusion on his rights.

An act to regulate the fisheries in the river Delaware and for other purposes. Passed November 26th, 1808. *Bloomf. L., p.* 204; *Rev. L., p.* 541. Section 1 fixes hours for fishing and penalty; section 2 limits end of season and penalty; section 3 defines a pool as fishing place; section 4 forfeits net for breach of statute.

Section 10. That if any person whoever shall cast or lay out any seine into Delaware river, within jurisdiction of this

state, beyond the right angle of the shore, and where his line strikes the river at low-water mark agoing out, &c., &c., or coming in—except by unavoidable accident—penalty $25, to be paid to the person against whose land such trespass shall be committed; recites agreement with Pennsylvania to protect and guard.   Therefore,

Section 11. If ship, during season, anchor on any fishing ground where shad are usually taken, and shall not be immediately removed from said fishing ground, if such removal can be done with safety, on application for that purpose by the owner or occupier of such fishery; or if such ship be wilfully run ashore on any such fishing ground, penalty $60, with costs, to be recovered by said owner or occupier.

Section 12. Relates to similar Pennsylvania law, which passed February 23d, 1809.   *Elm. Dig., p.* 200.

Section 13. Repeals act to regulate Delaware river fisheries, passed June 15th, 1799, and all other acts heretofore passed relative thereto.

A further supplement to act to regulate the fisheries in the Delaware of 1808.   Passed February 9th, 1819.

Section 1. Wherever fishery on Delaware river is occupied, owner or tenant, or person appointed by owner, shall give bond to clerk of county in which fishery is situated in $300 to pay fines for breach of the law, &c., and give description of fishery pool, in writing, name of township, number of men employed, &c., land, description, &c., to be filed, &c.   If any person shall fish without entering his fishery forfeits $100 and costs, to common informer, and if any person fish at a fishery entered as aforesaid, without permission from him entering the same, shall forfeit $200 and costs, to be recovered by him who entered the same.

Section 2. All penalties in this act—an act of 1808—except penalty of $200 above named, to go one-half to state and one-half to informer.

Section 3. Suit for penalties may be by warrant or summons.

Section 4. Repealer of all acts within the purview of this

act, but not to take effect till Pennsylvania legislature enacts it. Observe, when owner fails to enter his fishery and give bond, common informer recovers penalty; when any person fishes within bounds of a fishery that the owner enters, the owner recovers the penalty for himself.

Act to regulate fisheries on islands and bars in the river Delaware. Passed February 15th, 1819. *Rev. L., p.* 659.

Whereas, there have been difficulties between owners and occupiers of certain fisheries on islands and bars in Delaware river, and others occupying fisheries contiguous thereto on shores of said river, because limits of fisheries are not defined, &c.

Section 1. From passage of this act right of fishery on all islands and bars in Delaware river, within jurisdiction of New Jersey, shall be bounded by lines drawn from extreme upper and lower points of said islands and bars, at right angles to their general course and bearing. Penalty of $50 if owner of island or bar fishery lays out or swings net beyond said limits, to be recovered by the person whose fishery or right of fishery shall be trespassed on; provided owner may so lay out where there is no other fishery adjoining him; provided this act takes effect when Pennsylvania legislature shall enact it. Approved by Pennsylvania legislature, March 27th, 1820.

A further supplement to act to regulate the fisheries on river Delaware of 1808, passed November 28th, 1822.

Section 1. Prohibits fishing from sunset on Saturday till sunrise on Sunday. Penalty $250 and costs. But above tide-water owners or occupiers of eddy fisheries may begin at twelve o'clock Saturday night. Approved by Pennsylvania, January 29th, 1823, except proviso to section 1. 3 *Nix. Dig.* 316.

Section 2. Regulates how many seines may be drawn per day in one pool or fishing place. This is the word used by Faunce to devise his fishery in his will.

Section 3. Regulates size of mesh in certain places and times.

Section 4. Owner or possessor of every fishery upon the river Delaware, his tenant or agent, shall file bond for fines, &c., and description of pool and extent thereof, &c. Penalty of fine may be recovered on the bond, &c. If any person shall fish in bounds of pool without written permission of owner, possessor, &c., then owner, possessor &c., may recover $250 and costs, from trespasser.

Section 5. Penalty for fishing between April 1st and July 1st, without entering bond, &c., at any place than that named in description, $250 and costs.

Section 6. Any owner of any shore on Delaware river having entered the same as a fishery, below Trenton bridge, and given bond, &c., may fish in bounds thereof, prescribing size of mesh and net.

Section 7. Penalty, $250, for omission to observe above section 6.

Section 9. Penalty of $100 and costs, on constable, if he shirk duty.

Section 15. All penalties, except those given to party aggrieved (who was the owner or occupier), to go one-half to prosecutor and one-half to county in which offence committed.

Section 16. Repealer of previous acts so far as contrary to this act. Provided no rights vested to be affected.

A supplement to act of 1808, passed March 12th, 1852. *Pamph. L.* 1852, *p.* 212.

Section 1. No gill-net fisher, inhabitant of Pennsylvania or New Jersey, shall be subject to penalty for gill-net fishing in the Delaware river unless he shall fish in some pool or fishing place entered as such according to law; provided, that any person so fishing, except as to the entering of the place fished by him as his fishery, shall in all other respects conform to the laws regulating fisheries in said river; "and provided, further, that nothing in this act shall be construed to impair the right of the owner of any shore upon said river to the exclusive enjoyments of his fishery annexed thereto, upon entering the same as a fishery as aforesaid."

Section 3. Act to take effect as to such parts hereof as

Pennsylvania legislature may approve. Approved, Pennsylvania, April 15th, 1852.

An act extending the charters of the owners of certain fisheries. *Pamph. L.* 1879, *p.* 209.

Section 1. "That all acts for the incorporation of the owners of certain fisheries in any township of this state, which, according to the terms of their charters will expire," &c., &c., are hereby extended for twenty years, &c.

An act for the further protection of fisheries. *Pamph. L.* 1879, *p.* 255.

Section 1. "In any county of this state wherein any fishery is located, the fish commissioner may, on application of any owner, lessee or lessees of such fishery, designate a suitable person to act as deputy fish warden," &c., &c.

This line of legislation, uninterrupted for a century, shows conclusively a legislative recognition and protection of several fisheries on the Delaware river as private property. *Cobb* v. *Davenport*, 3 *Vroom* 383, was suit by owner of Green pond (a fresh-water lake) to maintain his exclusive right of fishery under a warrant from proprietors. Question was raised as to legislative recognition of private ownership in Green pond. In the charter by New Jersey legislature of the Morris Canal Company (*Pamph. L.* 1824, *p.* 165,) occur these words: "All loss and damages to the *owners of said ponds* or the lands flowed * * * being paid for agreeably to the provisions of this act." The use of these words was held by Depue, J., to be so conclusively a recognition of private ownership in the shore and bed of Green pond as to render further research superfluous.

This was the determination of the Supreme Court upon a legislative recognition made *pari passu* while granting a charter for a canal company. How much more force must be given to recognitions using the same words, running through an uninterrupted course of more than one hundred years, made by the state as a free and independent sovereignty, entering into a treaty with another state in regard to the protection, as private property, of the Delaware fisheries, and

by legislative action directed in terms to the regulation and protection of these fisheries in the Delaware river in which private property is recognized.

*d.* The decisions of the courts of New Jersey, which recognize ownership, in hands of private persons, of several fisheries in navigable rivers, are:

*Post* v. *Munn*, 1 *South.* 61. Munn owned a shad fishery and net on the Passaic river. While his net was out in the river, Post, who was navigating that part, ran through the net. There was evidence of design. Court, Southard, J., states as a fact that "the net and the right of the fishery belonged exclusively to the plaintiff," and held that plaintiff could recover not alone for mere tearing of the net, but also for losing the use of it—"the value of that use depends on the run of the shad." Kirkpatrick, C. J., says: "Munn was the owner of a fishery, and had a right to fish at a certain place in said river. Same principle is maintained in *Cobb* v. *Bennett*, 61 *Penna. St.*

*Arnold* v. *Mundy*, 1 *Halst.* 1. Action of trespass for entering on plaintiff's oyster-bed at mouth of Raritan river below ordinary low-water mark (page 2), and taking oysters there planted. Plaintiff owned a farm on the Raritan extending to bank of the river. His grantor had staked off part of the bed when he was in possession twenty years and more before, but his right was disputed by the people. Plaintiff in 1818 located the bed by warrant from East Jersey proprietors. Defendant entered and took oysters. *Held*, Kirkpatrick, C. J., that the title to land under navigable rivers, where tide ebbs and flows, is in the state; that the sovereign power held this title in trust for the use of the public, and that "the sovereign power itself, therefore, cannot consistently with the principles of the law of nature, and the constitution of a well-ordered society, make a direct and absolute grant of the waters of the state, divesting all citizens of their common right." No specific reference is made in the opinion of either Kirkpatrick or Rossell to Delaware river fisheries. Stockton, of counsel with plaintiff, says "shad fish-

eries of immense value have been transmitted from father to son time out of mind," and that "property in them has been admitted by the legislature in all their acts taxing and regulating them."

George Wood, of counsel for defendant, (page 37,) declares that "the doctrine above contended for [referring to his brief, which was accepted as the law of the case], does not interfere with the fisheries on the Delaware, where the owners possess the exclusive right of haul upon the adjacent shores."

Green, C. J., in *Gough v. Bell*, 2 *Zab.* 459, declares the doctrine of Kirkpatrick, C. J., to be too broad, and asserted the right of the legislature to appropriate the lands covered by water to individual enjoyment, to exclusion of common right of fishery.

*Martin* v. *Waddell* in United States Supreme Court on error from Circuit Court of United States in New Jersey), 16 *Pet.* 267–387. Ejectment by Waddell, plaintiff below, for lands (an oyster fishery) beneath navigable waters of Raritan river, where tide ebbs and flows. Not shown whether between high and low-water mark or below low-water mark. See Green, C. J., 2 *Zab.* 456, and Carpenter, J., in 4 *Halst. Ch.* 724.

Plaintiff claimed by virtue of survey under proprietors made in 1834; defendant claimed under act of legislature passed in 1824, and supplement of the same year. *Held,* Taney, C. J., that Arnold *v.* Mundy was conclusive as to right of the state as a sovereign to the soil under navigable rivers and the fisheries therein; and that independently of Arnold *v.* Mundy the court is of opinion that the proprietors were not entitled to the right of fishing, &c., in navigable tide-waters. In the brief of George Wood, leading counsel for the plaintiff in error, page 387, (16 *Pet.,*) he says: "In all the public waters of the state [New Jersey] they have two kinds of fisheries—common fisheries, and private or shore fisheries, belonging to the riparian owner. The latter is confined to those kinds of fish which were usually taken by hauling the net upon the shore, and are called shore fisheries. By

long usage these kinds of fisheries have grown into private rights belonging to the riparian owner, and have been recognized by repeated legislative acts. *Bennett* v. *Boggs*, 1 *Baldw.* 70. Those common fisheries and riparian several fisheries are all incompatible with the claims of the proprietors, who, under such claims, would have had several fisheries in all the rivers and disposed of them to their grantees."

*Gough* v. *Bell*, 2 *Zab.* 440, in Supreme Court, 3 *Zab.* 624, on error, established the existence of a local common law under which a riparian proprietor could and did claim and enjoy an exclusive right of several fishery in the waters and annexed to the shores of Delaware river. All the judges agreed substantially upon this proposition. Green, C. J., in his opinion in Supreme Court, which the majority of Court of Errors affirmed, shows the origin, growth and recognition of this common law by legislative sanction, judicial approval and universal conduct among the people of West Jersey. Read 2 *Zab.* 462–464. The learned Chief Justice clearly shows, by the decisions of the courts and by the laws of the state, that shore fisheries on Delaware river are recognized as and have all the incidents of private property.

On page 462, in speaking of shore fisheries and the rights of the owners therein, he says: "Such repeated and unequivocal legislative recognitions of a right, furnish proof of its existence which cannot be disregarded." In support of this he cites *Griff. L. R.* 1290, *note* 1, this note giving a history of the Delaware river tide-water fisheries (Bispham *v.* Rice), not elsewhere reported, and which was an action of ejectment to recover a shad fishery on the Delaware river just above Camden. This case was tried soon after Arnold *v.* Mundy, and most of the counsel in that cause were in this. "No doubt was intimated by any one of the counsel on either side as to title to fishery in either party by reason of paramount title of the state." He also cites *Bennett* v. *Boggs, Baldw.* 60. After showing that the property rights of the owners of shore fisheries on Delaware river do not depend upon any statute conferring the right, because the earliest statutes recognize the

title of the riparian proprietor as a pre-existing right; and after showing that they could not be maintained by prescription nor reconciled with the principles of the common law of England, he says: "The right of riparian proprietors to an exclusive right of fishery in the tide-waters of New Jersey in front of their land, must rest, it is apprehended, in custom or local usage variant from the common law. There is, then, I think, unquestionably in New Jersey, a local common law affecting title of riparian proprietors upon tide-waters, and conferring upon them rights and privileges unknown to the common law of England.    *    *    *    It remains to inquire whether this extension of the right of riparian proprietors in derogation of principles of common law is limited to the right of fishery, or whether it extends beyond it."

*State* v. *Jersey City*, 1 *Dutcher* 527. Tax case. Judge Elmer recognizes doctrine of Gough *v.* Bell, that riparian owners' title extends to and stops at high-water mark, and ruled that lands on the shore (which had been taxed to the plaintiff in *certiorari*) were not liable to taxation as property of a citizen, because owned by the state. Judge Elmer's language quoted with approval in *Stevens* v. *Paterson R. R.*, 5 *Vroom* 546.

*Howell* v. *Robb*, 3 *Halst. Ch.* 17, recognizes title of owner of shore fishery on Delaware river, and makes partition of it as real estate.

*Stevens* v. *Paterson R. R.*, 5 *Vroom* 533. Beasley, C. J., page 545, says: "The true doctrine with respect to this local custom [referring to Chief Justice Green's opinion in Gough *v.* Bell], is embodied in the opinion read in the Supreme Court by Green, C. J.," and adds "I consider the existence and legality of such a usage to be *res adjudicata* in this state."

*Attorney-General* v. *Delaware and Bound Brook R. R.*, 12 *C. E. Green* 10. Chancellor Runyon approves and quotes language of Green, C. J., in Gough *v.* Bell, where, in speaking of legislative recognition of Delaware river fisheries, he says: "Such repeated and unequivocal legislative recognitions of a

right furnish proof of its existence which cannot be disregarded."

As illustrations of the existence of a local common law, applicable to other cases, reference may be made to the body of law regarding meadows. In the *Pequest River Drainage case*, 12 *Vroom* 75, on error, Beasley, C. J., while denying that the act in question was a legitimate use of the legislative prerogative, held that with respect to its general scope and operation it could be vindicated. "The right," says the learned Chief Justice, "to appoint methods for drainage of meadows has been a branch of legislation that has existed in this state from the earliest times, and has been so frequently exercised and acknowledged that it has become a part of the local common law." The Chief Justice's statement of the law above quoted, and the reasons which he gives to support it, (12 *Vroom* 179, 180), apply with infinitely stronger force to this case (Faunce *v.* Fitzgerald), than to the one in which they are used.

So also in *Gough* v. *Bell*, (on error), 3 *Zab.* 657. The custom or local common law of this state allows the sheriff to leave goods of defendant in execution in the defendant's possession, instead of taking them into his own, varying in this particular from the common law. Same recognition of local common law has been made in other states.

*e. Arnold* v. *Mundy*, 1 *Halst.* 1, declared the right of the state between high-water and low-water mark to be in trust for all the people, and not to be absolutely alienable even by the sovereign power.

In *Gough* v. *Bell*, 2 *Zab.* 459, Green, C. J., says the doctrine of Kirkpatrick, C. J., on this point is too broadly stated, and intimates that the legislature may by grant "limit common rights or appropriate lands covered by water to individual enjoyment."

In *State* v. *Jersey City*, 1 *Dutcher* 527, Mr. Justice Elmer says the state's land under water "may be granted by the state to a stranger at any time before it is actually reclaimed and annexed to the upland."

*Stevens* v. *Paterson R. R.*, 5 *Vroom* 533, states the broad proposition that the state is absolute owner of the shore of all tide-water streams, with full power to grant without compensation before the license held by the local common law shall be executed and the land reclaimed. *Woolley* v. *Campbell*, 8 *Vroom* 168 ; *State* v. *Jersey City*, 13 *Vroom* 350 ; *R. R.* v. *Yard*, 14 *Vroom* 630, confirm this proposition.

The title of the state in these lands being thus shown to be that of an absolute proprietor and not that of a trustee, it is subject to all the incidents which attach to the ownership of lands in hands of private persons, may be subject to easements, may be barred by statute of limitations. *Rev., p.* 597, § 20, *" Limitations of Actions."*

The opinion of the court was delivered by

DEPUE, J. The case was tried below, and argued here principally upon the nature and quality of the rights which the owners of lands lying on the Delaware river on tide-water have in the fisheries in front of their lands. The legislative and judicial departments of the government have from an early period recognized a property in the riparian owners in the fisheries adjacent to their lands lying upon the tide-waters of the Delaware, which is exclusive of the common right of fishery which subsists at common law in all public waters. What the nature and quality of this property is, and whether it is superior to, or subordinate to, the title of the state in lands under tide-waters, need not be decided in this case. There are other questions to be disposed of before that question can arise.

A preliminary question is presented whether the plaintiff has such a grant from the state as will give him a standing to enable him to set up the rights of the state against the right of Christian Faunce under the Whitall deed. He could acquire such a standing only in virtue of a grant by the riparian commissioners, which the commissioners were empowered to make under the statutes authorizing them to grant and convey lands of the state under water.

The Wharf act of 1851 gave to the boards of chosen free-holders of the several counties the power to license owners of lands situate on or upon tide-waters, to build docks or wharves in front of their lands, or in any other way to improve the same.  *Rev.*, *p.* 1240.

The Riparian act of 1869 conferred on the riparian commissioners a more extensive power over the state's lands under tide waters than was conferred upon the boards of chosen freeholders by the Wharf act of 1851.  It gave the riparian commissioners power to make grants or leases of the state's lands to persons other than riparian owners.  *Rev.*, *p.* 982, § 8.  But the privileges of riparian owners are carefully preserved by the proviso in section 8, "that no grant or license shall be granted to any other than a riparian proprietor, until six calendar months after the riparian proprietor shall have been personally notified in writing by the applicant for such grant or license, and shall have neglected to apply for the grant or license, and neglected to pay, or secure to be paid, the price that said commissioners shall have fixed," with provisions for the mode of service of notice on minors, corporations and non-residents.

The Riparian act of 1869 applies only to the tide-waters of the Hudson river, New York bay and the Kill von Kull, lying between Enyard's dock, on the Kill von Kull, and the New York state line.  That such is the entire scope of the act is clear from its provisions.  The act of April 11th, 1864, to which the Riparian act of 1869 is a supplement, provided for the appointment of commissioners to cause surveys to be made of the "lands lying under the waters of the bay of New York and of the Hudson river, and of the lands adjacent thereto; the Kill von Kull, Newark bay, Arthur's Kill, Raritan bay, and the lands lying under the water of the Delaware river opposite to the county of Philadelphia,    *    *    *    and to fix and establish an exterior line in said bays and rivers beyond which no pier, wharf, bulkhead, erection or permanent obstruction of any kind should be permitted to be made, and to report to the next legislature, on or before

the 1st day of February then next,    *    *    *    and
to have prepared, and submit with their report, maps of
said land exhibiting the exterior line fixed and established
by them in said bays and rivers." *Rev., p.* 981.  The
commissioners made their report, dated February 1st, 1865,
but no action was taken upon their report until the supple-
ment of 1869 was passed.  By the first section of the latter
act the bulkhead line, or lines of solid filling, and the pier
lines in the tide-waters of the Hudson river, New York bay
and Kill von Kull, lying between Enyard's dock, on the Kill
von Kull, and the New York state line, so far as they had
been recommended and reported to the legislature by the
commissioners, were adopted and declared to be fixed and
established as the exterior bulkhead and pier lines between
the points above named.   No action was taken by the legisla-
lature adopting exterior lines elsewhere.   The second section
provided that it shall not be lawful to fill in with earth, stones
or other solid material in the tide-waters of the Hudson
river, New York bay and Kill von Kull beyond the bulk-
head line, or lines of solid filling, by this act adopted, fixed
and established, laid down and exhibited on the aforesaid
maps, and that it should not be lawful to erect or maintain
any pier or other structure exterior to the said bulkhead line,
or lines of solid filling, in any place or places where no exte-
rior line for piers is reported or indicated by said maps on the
Hudson river, New York bay and Kill von Kull.   By the
third section the Wharf act of 1851 was repealed as to the
tide-waters of the Hudson river, New York bay and Kill von
Kull.  Elsewhere the Wharf act was left in force.  The fourth
section gave the commissioners authority to give to any per-
son or corporation who, by any legislative act, was a grantee
or licensee of lands under water, or had power or authority to
acquire such lands, a paper in the name of the State of New
Jersey, conveying such lands, capable of being acknowledged
and recorded, with a proviso that the commissioners should
in no case grant lands under water beyond the exterior lines
by said act established, or thereafter to be established by leg-

islative authority. The eighth section, which has already been referred to, and is the only remaining section conferring on the commissioners power to grant lands of the state under water, makes such grants subject to the regulations and provisions of the first and second sections of the act—that is, to the bulkhead line, and lines of solid filling, in the Hudson river, New York bay and Kill von Kull, established by said sections; and in the proviso, with respect to notice to non-resident riparian owners, the notice is required to be published in a daily newspaper published in Hudson county, and also in a daily newspaper published in New York city.

· The provisions of the act of 1869 are wholly inapplicable to lands of the state under water elsewhere than within the limits designated in the act. Provision was made for grants of the state's lands under tide-waters by the riparian commissioners elsewhere than within the territory named in the act of 1869, by an act passed March 21st, 1871, which provided that any riparian owner of lands on tide-waters in the state might apply to the riparian commissioners for a lease, grant or conveyance of lands under water in front of his lands, and the commissioners were authorized to make such lease, grant or conveyance, to be executed as directed by the act of 1869, which should vest in the lessee or grantee all the right of the state in such lands, with proviso that nothing in the act should interfere with the prior acts as to the waters of the Hudson river, New York bay or Kill von Kull, easterly to Enyard's dock. *Rev., p.* 985.

The power of the riparian commissioners to make grants of the state's lands under water, under the act of 1871, is more restricted than it is under the act of 1869. Under the act of 1871 no one but a riparian owner can apply, and a grant by the commissioners to any one else would be *ultra vires*. In this respect the act of 1871 is analogous to the Wharf act of 1851. The words, "owner of lands situate along or upon tide-waters," in the act of 1851, and "riparian owner," in the act of 1871, are identical in meaning.

In *State* v. *Brown*, 3 *Dutcher* 13, a construction of the act of 1851 was made by the Supreme Court, which ap-

plies to the act of 1871. The facts in that case were these: Brown's title, which he acquired from one Merselis, was described as bounded on the New York bay. In his deed certain lands conveyed by Merselis to the Morris Canal and Banking Company were excepted. The conveyance to the canal company described the lands conveyed as lying in the vicinity of, and on the margin of New York bay—terms importing a boundary on the bay—and was to the canal company, their successors and assigns, " as long as used for a canal." Brown obtained a license from the board of freeholders to wharf out, and the question before the Supreme Court was whether the canal company had such title in the land as deprived Brown of the right to obtain a license for, and build a wharf in front on his farm. The Supreme Court, Chief Justice Green delivering the opinion, held that although the conveyance to the canal company was of a right to use the lands for a particular purpose only, and the grantee was restricted to that use of the estate, the company was the owner in fee of the land while the estate continued, and that although the canal company might have no right to build docks or wharves, the company, under its title, might prevent any other person from building docks and wharves in front of its land.

State v. Brown was reversed on error in this court, but not with respect to the ground on which it was decided in the Supreme Court. Indeed, Mr. Justice Whelpley, who delivered the reversing opinion, gave expression to substantially the same views, for he said that " the granting of the license to Brown conferred on him no right to dock out, unless he was the owner of the shore, and is of no use to him unless he is; his license is conditional, dependent upon his title; if he should undertake under that license to build the improvement authorized     *     *     *     it would be no protection against the legal owner of the shore." The reversal was on the ground that the question whether Brown was shore-owner or not could be determined only by a trial involving the merits of the case. *Brown* v. *Morris Canal*, 3 *Dutcher* 648.

In the present case the proof is that the Whitall tract con-

sisted in part of meadow land originally subject to the over-
flow of tides, and in part of upland, extending down to and
forming a natural bank along the river, and that before the
deed to Faunce was made, in 1818, an embankment had been·
constructed between high and low-water mark along the
meadow front.    This embankment was constructed for the
purpose of excluding the overflow of tides from the lowlands,·
and consisted of earth, and was faced with stones along the
river front, and was such a reclamation as, under Gough v. Bell,
gave the riparian owner title to the extent of the reclamation.
The embankment is seven or eight feet high, from twelve to·
sixteen feet wide at the bottom and about four feet wide at the·
top.    Ordinary high tides rise to one-third of the height of
the embankment, and extraordinary tides within two feet of
the top.    The embankment is used in fishing as a landing
for nets, and one of the capstans for drawing in the nets is·
located on the top of the embankment.

The operative words of conveyance in the deed from Whit-
all to Christian Faunce are "grant, bargain, sell, release and
confirm," with appropriate words to convey a fee.    The
premises conveyed are described as "the sole right, privilege,
use and enjoyment at all times for all. purposes of fishing
whatsoever, and for no other purpose," followed by a descrip-
tion of the lands embraced in the conveyance by metes and
bounds.

The deed gave the grantee the right to occupy the lands,
and there is no restriction on the manner in which he should
use them, other than generally for the purpose for which they
were conveyed.    The use and enjoyment of the lands by the
grantee, for the purpose for which they were granted, is ex-
clusive.

The deed to Faunce conveyed to him an actual estate, and
not a mere license or easement.    A grant of the exclusive use
of lands, as it excludes the grantor from all benefit in it, is a
grant of the soil itself, and not a mere easement.    Godd.
Easem. 5.    In Buszard v. Capel, 8 B. & C. 141, Lord Tenter- ·
den said that "it is difficult to understand how the exclusive

·use could be demised, and the land not;" and in the same case, in the Exchequer Chamber, Alexander, L. C. B., said " it is agreed that the finding of the jury—that the exclusive use of the land was demised, but the land itself was not demised—was inconsistent, because a grant of the exclusive use of the land is a grant of the land."    *Capel* v. *Buszard*, 3 *Y. & J.* 356.    The verdict in that case was sustained, it appearing by the indenture, which was· made part of the verdict, that the wharf only was conveyed with free liberty to load and land goods in common with other tenants over the lands in question.    Words of license or permission to occupy, or to enjoy, or to use are a demise of an actual estate in the lands.    2 *Platt Leas.* 23 ; 5 *Bac. Abr., tit.* "*Leases,*" *K*, 601 ; *Anon.*, 11 *Mod.* 42; 15 *Vin. Abr.*, "*License,*" *A*, 92.    A devise of the use of lands is a devise of an estate in lands. *Hance* v. *West*, 3 *Vroom* 233.    Conveyances to railroad, land and water companies, and to mining companies for a special use, as, for instance, for a depot, or for the accommodation and victualing of passengers; for a rail or tramway, for a ·canal or raceway, and of minerals and ores, are not uncommon. ·Such conveyances are always regarded as conveyances of estates in lands ; and if the words of conveyance are adopted to convey a fee, the estate granted will be a fee, though the grantee is restricted in the use of the estate conveyed.    *South-*·*ard* v. *C. R. R. Co.*, 2 *Dutcher* 13; *Cornelius* v. *Ivins, Id.* 377 ; *State* v. *Brown*, 3 *Id.* 13 ; *McKelway* v. *Seymour*, 5 *Id.* 321 ; *Hartwell* v. *Camman*, 2 *Stockt.* 128 ; *Zinc Co.* v. *Frank-*·*linite Co.*, 2 *Beas.* 322, 341, 342; *S. C.*, 2 *McCart.* 418 ; ·*Caldwell* v. *Fulton*, 31 *Penna. St.* 475–479.

The description of the premises conveyed to Faunce is :from a beginning corner to the middle of the meadow bank ; ·thence along the middle of the bank, the several courses and distances designated, until the line strikes the natural bank, which is a high piece of land ; thence to a stone near the river, and from thence out into the river to low-water mark. By this description Faunce took an estate in fee in the one-half of the bank, and in the strip of land. next to the river,

and became riparian owner.   If his estate was so qualified as to the use, that he could not make available to himself a grant under the act of 1871, the intervention of it between the upland and the river front would make the grant of the state to the plaintiff inoperative as against his title.   It was so decided in State v. Brown.

In addition to the infirmity of the plaintiff's title under the state's grant, arising from the fact that the defendant, and those under whom he justified, were owners of the strip of land along the river front, there is another consideration which would make the plaintiff's grant unavailing as against the defendant.   The deed of Whitall to Faunce was earlier in time than his conveyance to Newbold, under whom the plaintiff claims.   If Newbold is not chargeable with notice of Faunce's deed by its record, his deed contained an exception and reservation of the rights of Faunce by express reference to the Faunce deed.   Newbold and those claiming under him are bound by this exception and reservation and cannot deny its binding force.   *Sheppard* v. *Hunt*, 3 *Green Ch.* 277.   Under the conveyance to him Newbold took only a contingent estate in the premises conveyed to Faunce, to take effect on the determination or forfeiture of the latter's estate, but neither he nor his grantees could acquire a grant from the state which should work the forfeiture.

Applying these principles to the case in hand, the exception principally relied on was to the judge's charge, that as a matter of law the defendant had a right of fishery at the *locus in quo,* and was entitled to a verdict unless he did acts which did damage to the plaintiff that were not necessary in operating the fishery, and were outside of and beyond the rights and privileges of fishing granted to Christian Faunce in 1818 and in 1834 by the then land-owners.   The judge in his charge had expressly told the jury that if the defendant either negligently or carelessly or intentionally damaged the plaintiff unnecessarily, and beyond the privileges granted by Whitall on the upland, the jury should find for the plaintiff the amount of such damages.

This instruction was substantially correct, for by the law of this state owners of lands upon the Delaware river have a right of fishery adjacent to the shore front in their ownership, which is the subject of exclusive enjoyment and capable of alienation. This right, like other rights of riparian owners on the tide-waters of this state, is good against all persons except the state or its grantee; *Stevens* v. *P. & N. R. R. Co.*, 5 *Vroom* 532, 553, and the plaintiff is not in position to set up against this right, the right of the state, if the state has any right superior to the right of the riparian owner on the Delaware river in such a fishery.

The judge received in evidence, under objection, proof of conveyances and grants of other fisheries elsewhere along the river, and evidence touching the manner in which other fisheries were transferred and conveyed. This evidence, we think, was irrelevant, but the error in admitting it was immaterial, for the case stands upon the force and effect of the defendant's title.

The other exceptions have been examined, and in them we find no error.

The judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, DIXON, KNAPP, REED, SCUDDER, VAN SYCKEL, BROWN, COLE, PATERSON, WHITAKER. 12.

*For reversal*—None.